Relator's confinement being lawful, the relief prayed for is denied.

Opinion approved by the court.

On Motion for Rehearing.

MORRISON, Judge.

■■ In our original opinion, we said that relator was entitled to have his 25-year sentence construed as an indeterminate sentence of not less than 5 nor more than 25 years. He now asks that we reform such sentence. This is not the proper tribunal for such motion. Relator may move the trial court to do so. But whether this is done or not, the penitentiary authorities and the Board of Pardons and Paroles will be controlled in their treatment of relator, as they are in all cases, just as if the reformation had been effected. The provisions of Article 775, C.C.P., Vernon's Ann. C.C.P. art. 775, are mandatory.

Relator's motion for rehearing is overruled.

## LARKIN v. STATE.

### No. 24760.

Court of Criminal Appeals of Texas.

May 31, 1950.

On Rehearing June 21, 1950 and Jan. 23, 1952.

Rehearing Denied April 2, 1952.

Second Motion for Rehearing Denied April 30, 1952.

Third Motion for Rehearing Denied May 7, 1952.

Scarborough, Yates, Scarborough & Black, Abilene, for appellant.

Jim D. Bowmer (of Saulsbury, Skelton, Everton & Bowmer), Temple, on appellant's second motion for rehearing only.

George P. Blackburn, State's Atty., of Austin, for the State.

BEAUCHAMP, Judge.

This case comes on appeal from the District Court of Runnels County, Texas. The record contains no sentence and, consequently, no final judgment from which an appeal may be taken. This Court is without jurisdiction to consider the matters presented and the appeal is, accordingly, dismissed.

On Appellant's Motion for Rehearing

Since the dismissal of the appeal in this cause, supplemental transcript has been filed showing a nunc pro tunc order entering the sentence in the minutes of the court. Appellant's motion to re-instate the appeal is granted.

The appeal is from a conviction for embezzlement with a sentence of two years in the penitentiary. The facts of this case are most unusual. Appellant was Superintendent of Lake View School District of San Angelo. The board desired to construct a building for their expanding needs and employed an architect to draw the plans. Lumber for the project was scarce at the time. Negotiations were made for the purchase of some government owned surplus property, near Amarillo. This was in the form of buildings, which had to be dismantled and the lumber hauled to San Angelo. The board made a contract with appellant to do this work and haul the lumber to the school grounds. The terms of the contract are not all given and are immate-

rial. The two questions raised by appellant relate to the sufficiency of the evidence to show an appropriation of the property, and also its value.

The indictment alleges the embezzlement of "four roof trusses, of lumber construction, each of said trusses being of the value of Forty Dollars and the four of said trusses being of the total value of One Hundred and Sixty Dollars."

Testifying on the subject of appellant's employment, his duty and authority in the matter, T. D. Hill, Secretary of the school board, told of the transaction and then, on cross-examination by appellant, said that he attended all of the meetings of the school board during the period of time that they were negotiating with Larkin. Among other things, he said: "I was present on August 10, 1948, when Mr. Probst made a motion, seconded by Mr. Leddy, Mr. Larkin be authorized to use his own judgment in disposing of the war material that had been bought at Amarillo that couldn't be used in our program; at that time there was no limitation put on that motion; as a matter of fact the motion carried unanimously, I believe."

The purchase of this lumber and the deal with appellant were made before an architect had been employed. The board felt they had bought $22,550.00 worth of property for $1125.50. After the lumber was on the ground an architect was employed and the witness said that the architect told them that, instead of making money on the deal, they had bought a lot of junk. Further testifying, this State's witness said: "It is true that it will cost us more money to use those old trusses in the Negro school building than if we were not to use them; the architect told us it would cost us more money to use the old trusses and he told us that if we tore the trusses up the lumber we got out of it wouldn't pay for the labor it took to tear them up." The witness did not know of a market value and did not know what they were worth.

The State offered one witness who attempted to establish the value of this property. Joe Tharp, a general contractor, said that the eight trusses contained 3,784 feet of lumber and the four involved in this prosecution would have half that much. They were constructed of dimension lumber which, he says, is worth 8¢ per foot. This would make the four trusses involved worth $151.28. On cross-examination he said that he offered 8¢ per foot for only that part which he could use, and gave the conclusion: "Offhand I don't know that they could be sold for anything. I know when the lumber is taken down out of that truss that it will have holes in it where the bolts were."

As we understand his testimony he is valuing the lumber in the trusses after they have been dismantled, but he makes no estimate of the cost of dismantling the same.

The State then presented as a witness George Briley who testified that Mr. Larkin had placed the trusses in question with him for sale. He hauled them from appellant's farm near Abilene to Winters, in Runnels County, and exhibited them for sale, but was unable to find a purchaser for them. On re-direct examination he testified: "I knew they were Lake View School property; he told me they were at the time." On re-cross examination he said further: "He said those trusses belonged to the Lake View School but that he was trying to sell them to get the money for the Lake View School, I imagine." The witness was not able to find anyone to buy the trusses at any price; was not able to get any kind of a bid for them.

The testimony produced in this case is somewhat involved. Evidently there had been other transactions which might or might not have been admissible on the question of intent to appropriate the trusses involved in this prosecution to his own use and benefit. We have carefully considered all the evidence and are unable to find anything that aids the State's case. We are very doubtful that the evidence is sufficient to support a finding that appellant appropriated the property unlawfully. It does show that he stored a large amount of lumber, including the trusses involved, in a barn on his farm near Abilene. He later had these trusses hauled to Winters and had other lumber hauled into the City

of Abilene and either sold or offered it for sale. Some kind of litigation has taken place and a settlement was made whereby appellant paid a sum of money to the school board.

The authority given him, as stated by the secretary of the school board, would not be sufficient to authorize him to use the lumber for his own benefit. The school board had no power to give the property to him if they had attempted to do so. We think it was sufficient to authorize him to store and dispose of the lumber in whatever place or whatever manner he saw fit, so long as he was doing so for the benefit of the school board.

■ The evidence on the value of the property is insufficient to show what its value was. According to some of the quoted testimony, the trusses had no value as such. Proof of the value of the lumber was insufficient to give a basis for the finding that they were worth more than $50.00, because there is no evidence as to the cost of taking the trusses apart. The State has the burden of proving the value, but they have not offered any evidence to contradict the testimony brought out by the defendant—that the trusses alleged to have been embezzled were worthless.

For this, the judgment of the trial court will be reversed and the cause remanded.

On State's Motion for Rehearing

MORRISON, Judge.

This case was originally reversed for the reason that, as this Court then viewed the evidence, the State had failed to prove the value of the trusses embezzled, and the opinion expressed some doubt as to proof of appropriation.

This Court, as now constituted, has again reviewed the record. We are now of the opinion that the State sufficiently proved the value of the trusses alleged to have been embezzled.

■ The State was entitled to establish the allegations of the indictment as to the value of the trusses by showing (1) their market value at the time and place of the appropriation, or (2) if they had no market value, the amount it would cost to replace them. See Givens v. State, 143 Tex.Cr.R. 277, 158 S.W.2d 535; Cunningham v. State, 90 Tex.Cr.R. 500, 236 S.W. 89.

We quote from the testimony of Joe Tharp, a general contractor in the area of the alleged offense, as follows:

"I was present and checked the lumber that was hauled from Mr. Larkin's farm to San Angelo some time in July of this year. * * * I had occasion to go to Winters and help remove eight of these trusses; I took the measurements of those trusses; there's 3,784 feet of lumber in those 8 trusses: * * * I know that that lumber is worth 8 cents a foot. I was buying lumber every day and every week and know that it was worth that much. At eight cents the eight trusses would be worth $302.56; half of that would be $151.28; that was the market price at that time. * * * The type of lumber that was in those trusses at that time would have cost from 12 to 14 cents a foot."

On cross-examination, the witness said, "Each of those trusses would be worth about $40.00." The indictment charged the embezzlement of four roof trusses of the value of $40.00 each and of the total value of $160.00.

There appears in the record testimony which disputes Tharp's testimony as to the value of the trusses; some testimony denies that the trusses had any value whatever. This variance in the testimony on this point made an issue which it was for the trial jury to resolve.

■■ We feel that sufficient proof of value was made by Tharp's testimony, viewed in the light of the manner in which this matter is presented to this Court for review. If this manner of proving value did not meet with the approbation of appellant, it was incumbent upon him to voice his objection at the time of the introduction of the testimony, and then to bring the matter up to this Court for review in a bill of exception. This was not done.

■ The applicable rule is that even an erroneous method of proving value is not

ground for reversal unless excepted to and the error presented by a bill of exception. Thomas v. State, 85 Cr.R. 246, 211 S.W. 453. The alleged error in the State's method of proving the value is not here presented by bill of exception. This rule may be applied to the facts in this case in this way. Tharp testified as to value; he did not make his testimony specific as to time and place. Appellant knew the purpose of his testimony; if the same did not contain all the proper elements of the proof of value, then he should have objected to the receipt of any of it. This is not a case where the missing element could have been supplied by another witness. Either the witness Tharp knew the market value of the property alleged at the time and place necessary to establish the State's case or he did not. If he did not, he should not have been permitted to testify at all. His testimony on the point of value could have been stricken upon a timely objection, which appellant, if dissatisfied with such testimony, should have made but did not make.

Presiding Judge Davidson, in Ramon v. State, Tex.Cr.App., 98 S.W. 872, discussing the question of value and the method of proof thereof, pointed out that the district attorney had read the indictment to the witness (which contained a list of articles valued separately and in the aggregate) and then asked, "Did you lose these articles, and of that value, at and about that time?" To which the witness answered, "Yes, I did." It will be noted that this question did not incorporate market value at the time and place of the taking as in the case at bar, and the Court said, "We believe this is sufficient evidence to sustain the allegation of value; it being the only evidence in the record in regard to that matter. * * * If the accused objects to the manner of proving the value during the trial, he must reserve his bill. * * * The time for his objection or for raising the question is at the time of the introduction of the testimony."

Further, if the appellant had objected to the testimony as to the value given by the witness Joe Tharp on the ground that it was based upon the value of the component parts of the trusses rather than their market value, then the State would have had the opportunity of presenting other testimony, either of some qualified witness familiar with the subject who could testify as to market value, or of showing that there was no market value, followed by cost of replacement.

Appellant rather chose to join issue as to such value, made no objection to the State's proof, filed no motion to strike the State's testimony on the subject, and reserved no bill of exception to the State's method of establishing the value. In the absence of a bill of exception showing that the testimony proffered by the State as to value was admitted over his objection, he may not now be heard to say that the testimony offered by the State should be disregarded as of no probative force and that, therefore, the evidence is insufficient to sustain the verdict finding the defendant guilty of embezzlement of property of the value of $50.00 or over. See Ramon v. State, Tex.Cr.App., 98 S.W. 872; Thomas v. State, 85 Tex.Cr.R. 246, 211 S.W. 453; Cunningham v. State, 90 Tex.Cr.R. 500, 236 S.W. 89.

Attention is further directed to the fact that appellant himself, who was shown to have had quite some experience in dealing with second-hand lumber, thought the trusses in question were worth at least $30.00 apiece, since that is what he instructed Briley to sell them for.

The contention was raised by appellant that the State failed to prove the title to be in the independent school district, as alleged. The record discloses that the defendant came into possession of the property in question as agent for the independent school district and was holding the same in the fiduciary capacity at the time he converted it to his own use.

The original opinion expresses doubt as to the sufficiency of the evidence to show that appellant appropriated the trusses to his own use and benefit. The State's case seems to have been based on two premises:

1. That the appellant had no authority to dispose of the trusses, nor to store them at any place other than the Lake View School grounds, and

2. That the storing of such trusses in appellant's barn for the many months without knowledge of the school trustees constituted conduct inconsistent with his role as an agent, authorizing the conclusion that appellant had appropriated such trusses to his own use.

The appellant seems to defend on the following grounds:

1. That he had full and complete authority to dispose of any and all of the school's property, and

2. That the alleged reaffirmance of his agency by appellant in the late spring of 1949 was proof of the absence of intent to convert, and established that appellant had held the trusses since September, 1948, as the property of the school board.

The jury elected to choose the State's case.

It is incumbent upon this Court to determine if sufficient evidence exists to sustain their choice.

The witnesses, James Day, L. D. Bateman, Ellis Kirksey, and Albert Leddy, appellant's school trustees, testified that appellant's authority to sell surplus property did not include the trusses in question. They testified that appellant had been given no authority to store any of the school's property except at the school.

The witnesses, T. D. Hill and Jack Probst, also trustees, testified that appellant's authority to sell was much broader. However, all of the trustees testified that appellant had no authority to sell any lumber that might be used at the school. The records show that the trusses which were actually delivered to the school were used in the erection of bleachers and that further need for such trusses existed at the time of the trial.

If appellant did not have the authority to sell the trusses, there would be no logical explanation consistent with his innocence for his storing them at his barn for many months and later hauling them to Winters and offering them for sale.

The trusses were hauled to appellant's farm in September, 1948. The school board, to whom they belonged, knew nothing of this until late in May or early in June, 1949, and after the district attorney had been consulted.

The witness Johnny Fisher testified that early in May, 1949, the appellant had told him that he was in a "jam" over the school's lumber, that some of it was out at his farm, and that he was worried about it.

The witness George Briley also testified that he was consulted about moving certain lumber from appellant's farm to Winters, and tells of a most unusual "hot check" transaction between him and appellant. The fact that appellant initiated this bogus check transaction may, in itself, indicate that appellant had reason to make the self-serving declaration reasserting his agency when difficulty was staring him in the face. It may also explain the movement of the trusses to Winters. This fictitious transaction concerning the check becomes particularly important, since false statements designed to cover up the embezzlement constitute strong evidence of appropriation of the property in question. Powell v. State, 82 Tex.Cr.R. 163, 198 S.W. 317.

It will also be of interest to bear in mind that proof of a conversion may properly be made by circumstantial evidence. Collins v. State, 92 Tex.Cr.R. 388, 244 S.W. 153. Also, concealment and denials, together with a failure to account for the property held in trust, are sufficient circumstances to authorize a conviction for embezzlement. Jackson v. State, 44 Tex. Cr.R. 259, 70 S.W. 760.

In this connection, the record reveals that proof was offered and no objection interposed thereto that:

1. Appellant was planning to build a new house on his farm where the trusses in question were concealed.

2. Other property, such as doors, windows, board walks, lumber from bridges, and pine lumber, were hauled to appellant's farm and that it is reasonably inferrible that the same was the property of the injured school district.

3. Appellant never accounted to his principal, though often requested to do so, relative to his handling of the school's property of which the trusses were a part.

4. Appellant made an offer to the injured party to resign if they would not prosecute him, and, in settlement of a civil suit growing out of the same transaction of which the trusses were a part, appellant paid the injured party a substantial sum.

5. The trusses, as well as other property belonging to the injured party, were hauled by appellant to his farm on an isolated country road and there stored for many months without any proof of effort on the part of appellant to apply the same to the use of his principal.

■ This Court feels that the facts support the verdict. A similar state of facts was held to do so in Harrison v. State, 96 Tex.Cr.R. 468, 258 S.W. 472.

The State's motion for rehearing is granted; the judgment of reversal heretofore rendered is set aside; and the judgment of the trial court is affirmed. The conclusion arrived at herein was reached with full deference to the contrary view of our esteemed brother Beauchamp, J.

BEAUCHAMP, Judge (dissenting).

In view of the errors which I believe to be in the opinion approved by my associates granting the state's motion for rehearing and affirming the judgment, I wish to reiterate the statements made in the original opinion with proper emphasis. Preliminary to doing so, I wish to call attention to the record which wholly fails to fix any place where the embezzlement could be fastened upon appellant. It is not shown to be near Amarillo and it is not shown to be near Abilene, yet there could be no contention that it took place elsewhere. Proof of the value of the property should be made at the place where the embezzlement took place and not in the county which obtained jurisdiction because the property was transported into it for sale. I do not believe there is a contrary holding of this court and my associates cite none.

Even if I should be mistaken in this view, all of the proof in this case as to value is of second hand lumber at San Angelo and points west. Nothing refers to the market value of lumber at Abilene or Amarillo, or at Winters. Reliance for evidence, if any, showing the value of these trusses must be had upon the testimony of Joe Tharp, a contractor, who testified that the lumber in question was worth eight cents a foot as second hand lumber. He then said: "The type of lumber that was in those trusses at that time would have cost from 12 to 14 cents a foot." This could have had reference to nothing but new lumber of that type. He also testified that he was paying 8 cents a foot for second hand lumber in building a negro school, at another town several miles distant. At no time did he give a value of the trusses as such. He gave no estimate of the cost of dismantling the trusses. The only witnesses who did said that it would cost more than the value of the lumber. We quote further from Mr. Tharp on the value of the trusses. "Those trusses could be used for bleacher supports. I haven't had any demand for it. Off-hand I don't know that they could be sold for anything." No other witness gave any evidence in the case whatsoever that can be a basis for the finding of the value of the trusses as such.

I cannot agree that the evidence would authorize a jury to find that this lumber, if dismantled, would be worth 12 to 14 cents a foot and that the value of it in the trusses would be 8 cents per foot. I construe the evidence of Tharp to be that as second hand lumber out of the trusses it would be worth 8 cents a foot. This witness did say on cross-examination: "Each of those trusses would be worth about $40.00." But on further cross-examination he said: "Offhand I don't know that they could be sold for anything." This statement completely nullifies the first, in my opinion, and shows that he was at all times valuing the quantity of lumber in the trusses but not valuing the trusses. He never spoke in terms of market value. What an article "could be sold for" under some undisclosed condition does not establish market value. In the stress of emergencies, with which we are all familiar, many things during that time sold for prices far above market value.

Even if the state proves the value of the lumber, the cost of dismantling the trusses and thus calculates the value, I would challenge the sufficiency of such evidence to

show the market value of the articles alleged in the indictment. It would be like alleging theft of a raw material which admittedly has no market value and then to construct a value by showing what some manufactured article could be sold for and deduct the cost of manufacturing it to arrive at the cost of the raw material. A good sound hickory log may have no market value at Amarillo or Abilene, yet a genius may make it into hammer handles which would sell readily at a nice profit. Such method of proving market value would not be acceptable in a civil case. This provokes the question: "Should we take a man's liberty on less testimony than is required to take his money?"

George Briley, a witness in behalf of the state, had attempted to sell the trusses at Winters, in the county where the trial was had, and found no buyer for them. This state's witness said: "I wasn't able to find any one to buy the trusses at any price and wasn't able to get any kind of a bid or offer from anybody."

John Lynn Scott, an architect employed by the school district, made the positive statement that the lumber in the trusses, even if all of it were salvaged, would not be sufficient to pay the labor which he calculated would be required to take the trusses apart. He tried to give them to the contractor who built the building and he would not take them apart and use the material as a gift. This was at San Angelo.

On the other hand, the defendant offered positive proof by the witness Earl Thorp, a carpenter, who said he did not know of any market value for the trusses at San Angelo and that the lumber recoverable would not be worth what it would cost to tear the trusses up and put the lumber in second hand condition. In his opinion one of the trusses had no value. He qualified himself to testify to these facts.

The state has an exhibit showing a picture of the trusses. They are constructed of lumber cut into short pieces of irregular lengths, which are nailed and bolted together. This exhibit is common-sense and forceful evidence in support of that given by appellant's witnesses.

I think my associates are also a little insecure in their conclusion that the trusses were secluded by the appellant near Abilene, and only brought out after he learned that he was being investigated. It is an extreme construction of the evidence which I am not willing to give. Mr. T. D. Hill, who was Secretary of the Board, testified on cross-examination that appellant had authority to handle the lumber as he saw fit, as stated fully in the original opinion. The state sought to meet this by asking board members if the board gave him specific authority to handle the lumber as he did. This was not necessary as he had general authority to do it.

Following this, other members of the school board, testifying in behalf of the state, said that they had not authorized Mr. Larkin to dispose of this lumber or to store it in his barn near Abilene. Such evidence must be viewed as the construction which the witnesses chose to give to the authority which they had voted to him and is contrary to the foregoing language of the order. Their opinion of the contract can not be utilized to authorize the jury to find contrary to its plain terms.

I am firm in the conclusion that the appellant had authority to store and dispose of the lumber; that there is no evidence at any time that he ever used one foot of it for his own purposes, and only a suspicious circumstance that he intended to do so. In order to support the conviction evidence should be of more certain and positive nature. Man's liberty is not so cheap that it may be taken away from him on mere suspicious circumstances.

Appellant has filed a motion to have the mandate issued reversing his case. This raises quite a complicated question. I cannot be certain at this time about the merits of the motion. The majority opinion overlooks the motion entirely and I think it should be disposed of before action is taken that must be construed to be contrary. I most earnestly register my dissent. Whether this man is guilty or not, the evidence against him has not been admitted in accordance with the rules.

142

## On Appellant's Motion for Rehearing

GRAVES, Presiding Judge.

This cause has been before the court and discussed among the members thereof for nearly two years.

The opinion herein written by Judge Morrison has been gone over very carefully by this writer and agreed to by him as the proper disposition of the case.

The appellant's motion for rehearing upon which he relies for a reversal has been carefully considered by the writer. My brother Beauchamp has written a dissenting opinion herein quite at length and expressed his views therein. Therefore, I can see no reason for again discussing the matter. Suffice it to say that the writer agrees with the opinion of Judge Morrison as properly disposing of the case, and the motion for rehearing will therefore be overruled.

## On Appellant's Second Motion for Rehearing

Due to the difference of opinion among the members of this Court as to the sufficiency of the evidence to support the conviction, we have heretofore failed to write upon appellant's bill of exception complaining of the argument of the prosecutor.

In order to properly understand the argument complained of therein, it is necessary to review certain portions of the evidence. From the testimony of Mr. Day, one of the school trustees, we find the following:

"At the time the Board paid Mr. Larkin $6,500.00 he had not submitted any report of the expenses; I think his excuse for not doing so was that he did not have the bills together, or something, I really don't know what his excuse was. From November until May or June of this year I had various occasions to see Mr. Larkin in Board meetings; I discussed with Mr. Larkin the matter of making an accounting or report for what stuff he sold and what he got for it and he never at any time made an accounting to the Board, other than to tell us in round figures what he had been out on it; he never submitted those round figures in writing and he has not up to this time."

and further:

"I don't recollect Larkin ever making a report of the disposition of any of the oak flooring; I don't remember of his making any report to me of the selling of any of the oak flooring prior to the time of his arrest."

and further:

"I asked him for an accounting so that we would know how we made out on the job, but he always had some excuse."

From the testimony of Mr. Hill, another trustee, we note the following:

"Up to this day Mr. Larkin has never given us the number of loads he hauled; we had an agreement with Mr. Larkin to employ the labor to wreck the buildings, tear them down. Mr. Larkin has never up to this date given us the number of hours of labor employed in this connection, but he told us he had those records. He told Mr. Bateman he had the records but he wasn't going to produce them until the proper time; he was going to give them to his lawyer, I believe, was the statement that was made. From November when he reported that the buildings were wrecked up until the time Mr. Larkin was arrested, during that time we had asked him to give us a report. Mr. Bateman, Mr. Larkin and I were present and Mr. Bateman asked him about the report, if it was ready to turn in and I believe that's when he told us he had the report but he was going to turn it over to the lawyer at the proper time. After this thing was stirred up the defendant here, Mr. Larkin, told us he had some records but he was presenting them to his own lawyer and not to us."

and further:

"Up to this time the defendant has never made any report of what he used that check for, in my presence."

and further:

"In a conversation Mr. Larkin did mention that he sold so and so but I never saw any written *itimized* account

of the deal at all, myself; we never did get any itemized account of the number of loads hauled, the number of men employed, and what he paid them or what he got for the boiler."

and again:

"From the time I was elected Secretary he made no report and I did not find any report in the Minutes, when I was made Secretary."

From the testimony of Mr. Bateman, President of the School Board, we find the following:

"Mr. Larkin never submitted a written report as to the number of trips; if he ever told me how many trips there were it was oral; he never made a written report or gave a receipt of any kind and he has not to this date. Mr. Larkin has not made a report to me as to the amount of money he paid for labor, nor has he made a written itemized report of the sale of any window, door or anything of the kind; he made an oral report on a refrigerator machine and boiler, these are the only two items; I don't recall that he made any report on windows; whatever reports he made was by piecemeal or an item or two at a time. Mr. Larkin has made no report in writing of the number of loads he hauled or what he charged. I have access to the books by virtue of being President of the School Board and Mr. Larkin has turned in no report of the sale of anything."

and further:

"* * * and he was supposed to make an accounting of it and up to this time he has never made an accounting of it nor what he did with the money."

and further:

"I said Larkin never refused to make an accounting but he has never made one; he has always said he would. When Mr. Hill and I were talking to Larkin about (it) in June he didn't give us any of the records. The only records I got was on the moving of the buildings. We employed attorneys and

requested he make an accounting. I said that Larkin hadn't refused to make an accounting but he didn't make an accounting."

and further:

"From November of '48 until October '49 the defendant never did make an accounting and never has to this date."

It is with the state of the record in mind that we approach the question of argument. The bill recites that appellant's counsel, in his argument to the jury said:

"The school board has made no accounting and no report of the money spent, nor the money received. I say that he doesn't owe the school district anything; in fact, he has overpaid the school; there is the $6,000.00 they got for lumber; there is the $2,500.00 that he paid them out of his pocket; why don't the State of Texas put their cards on the table and let you see that he does not owe the school anything."

In his closing argument, the District Attorney said:

"E. O. Larkin has not reported to this day what he has done with that money." "Speaking of reports, here it is the 29th day of November, and still no report from Larkin." "In answer to Mr. Scarborough's question 'Why didn't we bring the cards and put them on the table.' E. O. Larkin is the only man that has the cards. E. O. Larkin is the only man that knows. E. O. Larkin is the only man that could bring us that information from his records. Why didn't E. O. Larkin make a report. Mr. Larkin knew that if he made a report that it would show that he was guilty of embezzlement."

■ The objection was that the above constituted a reference to the appellant's failure to testify. We find, first, that the argument is based on the evidence, and second, that it was made in answer to argument of appellant's counsel.

Finding no error in the bill, appellant's second motion for rehearing is overruled.