Richard William KUTZNER, Appellant,

v.

The STATE of Texas.

No. 74135.

Court of Criminal Appeals of Texas.

April 10, 2002.

Rehearing Denied June 12, 2002.

Jim Marcus, Houston, for Appellant.

Gail Kikawa McConnell, Asst. DA, Conroe, Matthew Paul, State's Atty., Austin, for State.

## OPINION

HERVEY, J., delivered the opinion of the Court in which MEYERS, PRICE, HOLCOMB and COCHRAN, JJ., joined.

This is an appeal from the convicting court's denial of appellant's motion for

DNA testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure. We affirm.

Appellant was convicted of capital murder and sentenced to death. This Court affirmed appellant's conviction and sentence on direct appeal. *See Kutzner v. State*, 994 S.W.2d 180 (Tex.Cr.App.1999). Following the disposition of his direct appeal, appellant unsuccessfully pursued various state and federal post-conviction remedies. After appellant exhausted these remedies, the convicting court set appellant's execution date for July 25, 2001. On July 16, 2001, nine days before his scheduled execution date, appellant filed a Chapter 64 motion in the convicting court for DNA testing. The convicting court declined to order DNA testing and appellant filed an appeal with this Court. We *sua sponte* ordered the parties "to brief the issue of this Court's jurisdiction to review a convicting court's adverse finding or conclusion under Art. 64.03 V.A.C.C.P." *Kutzner v. State*, No. 74, 135 (*per curiam* order delivered July 24, 2001) (nonpublished).

## I. Constitutional Jurisdiction

■ The State claims that this Court does not have subject matter jurisdiction over this Chapter 64 DNA appeal. This Court has only such powers as are conferred on it by the Constitution and by statutes that do not conflict with the constitutional grant of jurisdiction. *See Ex parte Minor*, 115 Tex.Crim. 634, 27 S.W.2d 805, 806–07 (1930); *Ex parte Firmin*, 60 Tex.Crim. 222, 131 S.W. 1116, 1117 (1910) (op. on reh'g); *Ex parte Davis*, 947 S.W.2d

216, 223 (Tex.Cr.App.1996) (McCormick, P.J., concurring) (maj.op.).

### A.

Article V, Section 5, of the Texas Constitution, sets out this Court's subject matter jurisdiction. The general grant of appellate jurisdiction for the Court of Criminal Appeals is set out in the first paragraph of Section 5 which provides that this Court shall have final appellate jurisdiction "in all criminal cases" with "such exceptions and under such regulations as may be provided in this Constitution or as prescribed by law." [1]

■ The State argues that this Chapter 64 DNA appeal is not a "criminal case" because appellant "has not been found guilty of anything and no punishment has been assessed." The Legislature enacted Chapter 64 as part of the Code of Criminal Procedure. A Chapter 64 proceeding is closely connected to, and could affect, a conviction and sentence assessed to a criminal defendant in a criminal case. Like a bail bond forfeiture proceeding, this Chapter 64 proceeding is a "criminal case" because it "is too closely connected" with the criminal case in which appellant was convicted and received the death penalty. *See generally Jeter v. State*, 86 Tex. 555, 26 S.W. 49, 49–50 (1894) (bail bond forfeiture proceeding is "criminal case" in part because the criminal case for which the bond is given "is too closely connected with the [bail bond] to be separable from it"). [2]

The State relies on various cases which we find distinguishable primarily because,

---

1. The first paragraph of Section 5 states:
 The Court of Criminal Appeals shall have final appellate jurisdiction coextensive with the limits of the state, and its determinations shall be final, in all criminal cases of whatever grade, with such exceptions and under such regulations as may be provided in this Constitution or as prescribed by law.

2. *See also Basaldua v. State*, 558 S.W.2d 2, 4 (Tex.Cr.App.1977) (relying on Article 44.42, Texas Code of Criminal Procedure, for the proposition that an appeal from a judgment forfeiting a bail bond is a "criminal case").

unlike this case, these cases did not involve a statute that specifically authorized an appeal.[3] These cases apparently would have been decided differently had there been such a statute. These cases, therefore, appear to merge the constitutional question of what constitutes a "criminal case" under Section 5 with the question of whether an appeal is authorized by statute.[4]

For example, *Paprskar* decided that a proceeding to expunge arrest records was not a criminal case in part because there were no "criminal penalties" attached to the proceeding and it was not brought "by or in the name of the State and the persons against whom the action was brought [were] not charged with having committed a crime or violated any penal statute." *See Paprskar*, 573 S.W.2d at 528. *Paprskar* further noted that the expungement of arrest records proceeding did not "fall within the standard definition of a criminal matter" and that "the fact that the statutory basis of this action is contained in the Code of Criminal Procedure" did not make it a "criminal case." *See id. Paprskar*,

however, also rested its decision on the lack of either "constitutional [or] statutory authority" that authorized an appeal. *See id.* As previously noted, it appears that *Paprskar* would have been decided differently had there been a statute authorizing the appeal.

We also take note of two other cases cited in the State's brief. In *Bretz v. State*, this Court, summarily and without discussion, decided that Section 5 did not authorize an appeal from a trial court's order under Article 47.02, Texas Code of Criminal Procedure,[5] denying the defendant's application for restoration of certain property after the defendant was acquitted for receiving and concealing stolen property. *See Bretz v. State*, 508 S.W.2d 97, 98 (Tex.Cr.App.1974) (nothing in criminal case to appeal after defendant's acquittal). We also note that in *Bretz* there was no statute authorizing the appeal.

And, in *Hardin v. State*, this Court decided that a defendant's appeal from a jury's findings in a criminal case that the defendant was sane at the time of the offense but insane at the time of trial was

**3.** *See Ex parte Paprskar*, 573 S.W.2d 525, 527-28 (Tex.Cr.App.1978) (no constitutional or statutory authority authorizing an appeal from an order on a motion for expunction of arrest records), *overruled by and to the extent it conflicts with, Weiner v. Dial*, 653 S.W.2d 786, 787 fn. 1 (Tex.Cr.App.1983) (overruling *Paprskar* to the extent it would support holding that statutory "provision for appointment and compensation of attorneys to represent indigent defendants" in criminal cases is not a "criminal law matter" for purposes of this Court's original mandamus jurisdiction under Section 5); *Armes v. State*, 573 S.W.2d 7, 8–9 (Tex.Cr.App.1978) (no constitutional or statutory authority authorizing an appeal from an order ordering the defendant to appear before a California grand jury); *Walker v. State*, 537 S.W.2d 36, 37–38 (Tex.Cr.App.1976) (no jurisdiction over appeal from pretrial order that sureties on a bail bond are insufficient because jurisdiction in bail bond cases "is restricted by statute to appeals or writs of error

from a final judgment forfeiting the bail bond"); *De Silva v. State*, 98 Tex.Crim. 499, 267 S.W. 271, 272 (1924) (no constitutional or statutory authority authorizing an appeal from a post-conviction judgment declaring defendant sane).

**4.** *See, e.g., Bradley v. Miller*, 458 S.W.2d 673, 674 (Tex.Cr.App.1970) (one seeking to invoke jurisdiction of Court of Criminal Appeals must point to some constitutional or statutory provision conferring such right and bring himself within the procedure prescribed).

**5.** Article 47.02, in relevant part, provided then as it does now:

Upon trial of any criminal action for theft, or for any other illegal acquisition of property which is by law a penal offense, the court trying the case shall order the property to be restored to the person appearing by the proof to be the owner of the same.

not a "criminal case" because the accused had not been "found guilty of anything, and no punishment ha[d] been assessed." *See Hardin v. State,* 157 Tex.Crim. 283, 248 S.W.2d 487, 487 (1952).[6] *Hardin,* however, relied on *Griffin v. State* which decided that a defendant's appeal from a pretrial order finding him competent to stand trial was not a "criminal case" because it did not amount to a "conviction of an offense" and there was neither "constitutional provision nor statutory authority" authorizing the appeal. *See Griffin v. State,* 29 S.W.2d 349, 350 (Tex.Cr.App. 1930). *Hardin,* therefore, relied on a case which may have been decided differently had there been a statute authorizing the appeal.

This Chapter 64 DNA appeal arguably is not a "criminal case" under cases such as *Hardin,* because appellant has not been "found guilty of anything, and no punishment has been assessed."[7] The overriding principle to be gleaned from all of these authorities, however, is that this Court will entertain an appeal when it is expressly authorized by statute and when it is related to the "standard definition" of a criminal case.[8]

We have not found any case, and the State cites none, where this Court has not entertained an appeal in such a case. And, we have found at least one case where this Court has entertained an appeal unauthorized by statute in a proceeding that does not fit *Hardin's* definition of "criminal case." *See White,* 591 S.W.2d at 853–54; *Jackson,* 548 S.W.2d at 689–90. We also note that accepting the State's claim that we should apply *Hardin's* definition of "criminal case" would call into question our jurisdiction to review most of the matters that the State may appeal pursuant to Article 44.01, Texas Code of Criminal Procedure, since these matters do not involve a situation where an accused has been found guilty of something and punishment has been assessed. We hold that a Chapter 64 DNA proceeding is a "criminal case" for Section 5 purposes.

**B.**

■ The State also argues that even if this Chapter 64 DNA appeal is a "criminal case," this appeal lies in a court of appeals under the second paragraph of Section 5 which provides that the appeal "of all [non-death penalty] criminal cases" shall be to the courts of appeals.[9] This argument, however, fails to give effect to the first

---

6. *See also White v. State,* 591 S.W.2d 851, 853–54 (Tex.Cr.App.1979) (discussing when appellate review of competency hearings is authorized while also noting that a competency hearing is not "criminal in nature"); *Jackson v. State,* 548 S.W.2d 685, 689–90 (Tex.Cr.App.1977) (pretrial competency hearing may be appealed in an appeal from the trial on the merits because, even though such a hearing is not a criminal action as such in that a determination of guilt/innocence is not made, it is ancillary to the main criminal proceeding and, therefore, quasi-criminal in a sense that a finding of competency is a necessary prerequisite to subjecting the accused to a criminal trial for the offense charged).

7. *See Hardin,* 248 S.W.2d at 487; *see also Paprskar,* 573 S.W.2d at 528; *Bretz,* 508 S.W.2d at 97–98.

8. *See Bradley,* 458 S.W.2d at 674 (one seeking to invoke this Court's jurisdiction must bring himself within some constitutional or statutory provision conferring such right).

9. The second paragraph of Section 5 states:

The appeal of all cases in which the death penalty has been assessed shall be to the Court of Criminal Appeals. The appeal of all other criminal cases shall be to the Courts of Appeal as prescribed by law. In addition, the Court of Criminal Appeals may, on its own motion, review a decision of a Court of Appeals in a criminal case as provided by law. Discretionary review by the Court of Criminal Appeals is not a matter of right, but of sound judicial discretion.

paragraph of Article V, Section 6, of the Texas Constitution, which provides that the courts of appeals shall have appellate jurisdiction "under such restrictions and regulations as may be prescribed by law." [10] This "under such restrictions and regulations as may be prescribed by law" language in the first paragraph of Section 6 empowered the Legislature to make a Chapter 64 DNA proceeding appealable here. *Compare Davis*, 947 S.W.2d at 223 (discussing legislature's constitutional power to "regulate" this Court's original habeas corpus jurisdiction).

## II. Statutory Jurisdiction

Article 64.03(a), Texas Code of Criminal Procedure, states:

(a) A convicting court may order forensic DNA testing under this chapter only if:

(1) the court **finds** that:

(A) the evidence:

(i) still exists and is in a condition making DNA testing possible; and

(ii) has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect; and

(B) identity was or is an issue in the case; and

(2) the convicted person establishes by a preponderance of the evidence that:

(A) a reasonable probability exists that the person would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing; and

(B) the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice.

(Emphasis Supplied).

Article 64.05, Texas Code of Criminal Procedure, states:

An appeal of a **finding** under Article 64.03 or 64.04 is to a court of appeals, except that if the convicted person was convicted in a capital case, the appeal of the finding is a direct appeal to the court of criminal appeals.

(Emphasis Supplied).

The record reflects that the convicting court's order denying appellant's motion for DNA testing contains two "conclusions of law" that appellant failed to establish the two Article 64.03(a)(2) requirements. Appellant challenges these conclusions of law in this appeal.

 The State, however, argues that this Court has "no jurisdiction to hear this appeal of the [convicting court's Article 64.03(a)(2)] conclusions of law" because Article 64.05 only authorizes an appeal of the convicting court's "finding." We reject this narrow and hypertechnical construction of Article 64.05.

 The State's contention requires this Court to construe the Article 64.05

10. The first paragraph of Section 6 states:
The state shall be divided into courts of appeals districts, with each district having a Chief Justice, two or more other Justices, and such other officials as may be provided by law. The Justices shall have the qualifications prescribed for Justices of the Supreme Court. The Court of Appeals may sit in sections as authorized by law. The concurrence of a majority of the judges sitting in a section is necessary to decide a case. Said Court of Appeals shall have appellate jurisdiction co-extensive with the limits of their respective districts, which shall extend to all cases of which the District Courts or County Courts have original or appellate jurisdiction, under such restrictions and regulations as may be prescribed by law. Provided, that the decision of said courts shall be conclusive on all questions of fact brought before them on appeal or error. Said courts shall have such other jurisdiction, original and appellate, as may be prescribed by law.

phrase "appeal of a finding under Article 64.03." We normally construe a statute according to its "plain [textual] meaning" without resort to extratextual sources. *See Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Cr.App.1991). We will, however, resort to extratextual sources such as legislative history to construe a statute if we decide that the statute is ambiguous [11] or that construing it according to its "plain [textual] meaning" will lead to "absurd consequences." *See Jordan v. State,* 36 S.W.3d 871, 873 (Tex.Cr.App.2001). Our constitutional duty, of course, is to effectuate what the Legislature intended when it enacted the statute. *See Boykin,* 818 S.W.2d at 785.

We decide that the Article 64.05 phrase "appeal of a finding under Article 64.03"

can have different meanings and is, therefore, ambiguous.[12] It could, for example, refer only to the findings that a convicting court makes under Article 64.03(a)(1).[13] It could also refer to any finding that a convicting court makes under Article 64.03. The latter is arguably a more reasonable construction since Article 64.05 refers to an "appeal of a finding under Article 64.03" and not to an appeal of only findings under Article 64.03(a)(1). We will, therefore, resort to extratextual sources to construe the Article 64.05 phrase "appeal of a finding under Article 64.03."

We initially recognize that nothing in the legislative history of Chapter 64 indicates a legislative intent to foreclose an appeal of the convicting court's Chapter 64.03(a)(2) determinations.[14] Our review

---

**11.** *But see* Section 311.023, Texas Government Code, (authorizing courts to consider extratextual sources in interpreting a statute even one that is not ambiguous on its face); Article 1.26, Texas Code of Criminal Procedure, (requiring courts to "liberally" construe the Code "so as to attain the objects intended by the Legislature").

**12.** *See, e.g., Ex parte Torres,* 943 S.W.2d 469, 472–73 (Tex.Cr.App.1997) (phrase "final disposition" has various meanings); *Ramos v. State,* 934 S.W.2d 358, 364–65 (Tex.Cr.App. 1996), cert. denied 520 U.S. 1198, 117 S.Ct. 1556, 137 L.Ed.2d 704 (1997) ("persons" provision in Article 18.02, Texas Code of Criminal Procedure, did "not appear to have a clear and unambiguous meaning") *Lane v. State,* 933 S.W.2d 504, 514 (Tex.Cr.App.1996) (term "provide" in Article 38.22, Section 3(a)(5), Texas Code of Criminal Procedure, capable of two meanings); *Hines v. State,* 906 S.W.2d 518, 520 (Tex.Cr.App.1995) (statute at issue was ambiguous because it did not "plainly" discount or embrace the State's construction of it).

**13.** We would note, however, that Article 64.04, Texas Code of Criminal Procedure, requires the convicting court to "make a finding" on whether DNA test results are favorable to the convicted person. Article 64.04 provides:

After examining the results of testing under Article 64.03, the convicting court shall hold a hearing and make a finding as to whether the results are favorable to the convicted person. For the purposes of this article, results are favorable if, had the results been available before or during the trial of the offense, it is reasonably probable that the person would not have been prosecuted or convicted.

**14.** Hearings on SB 3 Before the Senate Jurisprudence Committee, 77th Leg., R.S., (*www.senate.state.tx.us*, Senate Jurisprudence Committee Video and Audio Archives at 0:2:48–0:31:30, February 5, 2001).

Hearings on SB 3 Before the Senate Jurisprudence Committee, 77th Leg., R.S., (*www.senate.state.tx.us*, Senate Jurisprudence Committee Video and Audio Archives at 0:15:56–0:17:57, February 12, 2001).

Senate Debate on SB 3, 77th Leg., R.S., (*www.senate.state.tx.us*, Senate Video and Audio Archives at 0:17:18–0:37:49, February 19, 2001).

Hearings on SB 3 Before the House Criminal Jurisprudence Committee, 77th Leg., R.S., (*www.house.state.tx.us*, House Criminal Jurisprudence Committee Archived Committee Broadcasts at 0:00:00–0:8:00, February 27, 2001).

of the legislative history of Chapter 64 actually supports deciding that the Legislature intended to authorize appellate review of all of the convicting court's Article 64.03 determinations. For example, as originally introduced, Senate Bill 3 (which later became Chapter 64) did not provide for any appellate review of the convicting court's determinations under Chapter 64. Early in the legislative process, the Senate Jurisprudence Committee added an amendment that authorized an appeal of only the convicting court's "findings under proposed Article 64.04." [15]

The House Criminal Jurisprudence Committee later amended the Senate Jurisprudence Committee's version of Article 64.05 to authorize an "appeal of a finding under Article 64.03 or 64.04." The House Criminal Jurisprudence Committee bill analysis explained that this amendment "provides for an appeal of a convicting court's **determination** to order testing" [16] under Article 64.03, and the House Re-search Organization bill analysis also explained that this amendment authorized "[a]ppeals of orders for tests [under Article 64.03] or of findings about test results [under Article 64.04]." [17] Both houses of the Legislature, without any mention of the specific issue the State presents here (i.e., distinctions between "findings" and "conclusions of law") and without any mention of limiting appellate review to the convicting court's findings under Article 64.03(a)(1), enacted this version of Article 64.05.

We also note that the State's construction of Article 64.05 would prevent this Court from remedying a convicting court's erroneous Article 64.03(a)(2) determinations. And, construing Article 64.05 to limit appellate review to the convicting court's findings under Article 64.03(a)(1) would likewise preclude adequate review of erroneous court orders. This is inconsistent with the purposes of Article 64.05, as stated by the supporters of Chapter 64, to

House Debate on SB 3, 77th Leg., R.S., (*www.house.state.tx.us*, House Archived Chamber Broadcasts at 1:08:00–2:37:00, March 21, 2001).

House Debate on SB 3, 77th Leg., R.S., (*www.house.state.tx.us*, House Archived Chamber Broadcasts at 1:15:00–1:18:00, 1:58:00–2:01:01, March 22, 2001).

Senate Debate on SB 3, 77th Leg., R.S., (*www.senate.state.tx.us*, Senate Video and Audio Archives at 0:46:13–0:47:00, March 26, 2001).

Senate Debate on SB 3, 77th Leg., R.S., (*www.senate.state.tx.us*, Senate Video and Audio Archives at 4:12:00–4:22:00, April 2, 2001).

House Debate on SB 3, 77th Leg., R.S. (*www.house.state.tx.us*, House Archived Chamber Broadcasts at 0:47:00–0:55:22, April 3, 2001).

Senate Jurisprudence Committee, Bill Analysis of SB 3, 77th Leg., R.S., (February 13, 2001).

House Criminal Jurisprudence Committee, Bill Analysis of SB 3, 77th Leg., R.S., (March 4, 2001).

House Research Organization, Bill Analysis of SB 3, 77th Leg., R.S. (March 21, 2001). Senate Research Center Analysis of SB 3, 77th Leg., R.S., (June 18, 2001).

**15.** Senate Jurisprudence Committee, Bill Analysis of SB 3 at 3–4, 77th Leg., R.S., (February 13, 2001). This proposed version of Article 64.05 would not have authorized appellate review of any of the convicting court's Article 64.03 determinations since this proposed version of Article 64.05 stated:

Provides that an appeal of a finding under Article 64.04 is to a court of appeals, except that if the convicted person was convicted in a capital case, the appeal of the finding is a direct appeal to the court of criminal appeals.

**16.** Emphasis Supplied.

**17.** House Criminal Jurisprudence Committee, Bill Analysis of SB 3 at 3, 77th Leg., R.S., (March 4, 2001).

House Research Organization, Bill Analysis of SB 3 at 3, 77th Leg., R.S. (March 21, 2001).

"give convicted people full access to the courts" and to "provide a check on individual courts' decisions."[18]

We also consider the consequences of the State's construction of Article 64.05. *See* Tex. Gov't Cd., Section 311.023(5) (in construing a statute, a court may consider the consequences of a particular construction). In cases like this, for example, under the State's construction of Article 64.05, had the convicting court made its Article 64.03(a)(2) determinations a part of its "findings" rather than a part of its "conclusions of law," then this Court would have jurisdiction to review them under Article 64.05. Different treatment of similarly situated convicted persons in terms of what they can appeal depending on whether the convicting court labels its Article 64.03(a)(2) determinations as "findings" or "conclusions of law,"[19] could not have been intended. We hold that Article 64.05 authorizes this Court to review the convicting court's determinations under Article 64.03.

### III. The Merits Of Appellant's Chapter 64 DNA Appeal

#### A.

In point of error one, appellant claims that in denying his motion for DNA testing the convicting court erroneously applied a "sufficiency of the evidence" standard instead of Article 64.03(a)(2)(A)'s "reasonable probability" standard of whether appellant "would have been convicted or prosecuted in light of exculpatory DNA tests." Appellant argues that "[b]ecause the [convicting] court limited its review to the sufficiency of the State's case at trial,

it could not correctly assess whether the information that has emerged since the trial, coupled with exculpatory DNA test results, would undermine confidence in the jury's verdict."

The record does not support appellant's claim that the convicting court limited its consideration to the sufficiency of the evidence presented at appellant's trial. Appellant concedes as much in his brief by recognizing that the convicting court "entered only three findings addressing evidence outside of the trial record." Point of error one is overruled.

#### B.

In point of error two, appellant claims that the convicting court erroneously determined under Article 64.03(a)(2)(A), that appellant failed to establish by a preponderance of the evidence that a reasonable probability exists that appellant would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing. In point of error three, appellant claims that the convicting court erroneously determined under Article 64.03(a)(2)(B) that appellant failed to prove by a preponderance of the evidence that his request for DNA testing is not made to unreasonably delay the execution of sentence or administration of justice.

It will be helpful to an understanding of our disposition of these points to set out the evidence presented at appellant's trial. Appellant was convicted in September 1997 of a capital murder that was committed in January 1996. *See Kutzner,* 994

---

18. *See* House Research Organization Bill Analysis of SB 3 at 8, 77th Leg., R.S. (March 21, 2001) (noting that supporters of SB 3 claim that by allowing appeals of court orders for tests and of findings about test results, SB 3 would give convicted people full access to the courts and would provide a check on individual courts' decisions).

19. This Court would have jurisdiction to review the former but not the latter even though they are appeals of the same thing—the convicting court's Article 64.03(a)(2) determinations.

S.W.2d at 182–84. Identity was the main contested issue at appellant's 1997 trial. *See id.* The evidence from appellant's trial showed that the victim's body was discovered in her real estate business office. *See id.* The victim's wrists were bound with red electrical wire. The victim's neck and ankles were bound with plastic tie wraps. *See id.* A computer keyboard and a videocassette recorder were missing from the victim's office. *See id.*

Police seized red electrical wire from appellant's home and from appellant's repossessed truck. This red electrical wire bore the same manufacturer's number as that on the red electrical wire which bound the victim's wrists. *See id.* Evidence was presented at trial that this wire was manufactured in New York and was not common in the area where the offense occurred. *See id.*

The police also seized plastic tie wraps from appellant's driveway, from his garage and from his repossessed truck. *See id.* These tie wraps were similar to those found around the victim's neck and ankles. *See id.* An FBI toolmark examiner determined that the tie wraps around the victim's neck and ankles had been cut with tin snips that were recovered from appellant's repossessed truck. *See id.*

The police seized the victim's videocassette recorder from the residence of a person named Roy Landry who had known appellant for many years and who had worked for appellant in appellant's air conditioning repair business. *See id.* Landry testified at appellant's trial that he received the videocassette recorder and the victim's computer keyboard from appellant. *See id.* Landry testified that appellant subsequently retrieved the computer keyboard. *See id.* Another witness testified that appellant brought her the computer keyboard. *See id.* Another witness testified that appellant stated to him several times that tie wraps would be good things to use to kill someone. *See id.* The State also introduced into evidence a note that was found in the victim's real estate office. This note was in the victim's handwriting and it contained appellant's alias, appellant's wife's nickname, appellant's phone number, appellant's street address and a reference to two big dogs. The evidence showed that appellant owned two big dogs. During the punishment phase of appellant's trial, the State presented evidence that, about two and a half weeks before this offense, appellant murdered another woman under circumstances strikingly similar to those present in this case. *See id.*

Appellant was also convicted and sentenced to death for this other murder, and we affirmed this conviction and sentence on direct appeal in an unpublished opinion. *See Kutzner v. State,* slip op. at 33 (Tex. Cr.App. No. 72,805, delivered January 13, 1999) (nonpublished) ("Kutzner II"). Overwhelming circumstantial evidence establishes appellant's guilt in *Kutzner II.* *See Kutzner II,* slip op. at 2–7. Among other things, the evidence from *Kutzner II* shows that the victim's legs, neck and wrists were bound with plastic tie wraps similar to the ones used in this case. *See Kutzner II,* slip op. at 3.

## 1. ARTICLE 64.03(a)(2)(A)

In this Chapter 64 proceeding, appellant requests DNA testing of fingernail scrapings recovered from the victim during her autopsy, of a strand of white hair recovered from the tie wrap around the victim's neck, and of a small black hair recovered from a piece of cellophane on the victim's body. Appellant claims that if this testing is favorable to him, a reasonable probability exists that he would not have been prosecuted or convicted in light of "new" post-trial information which appellant

claims significantly weakens the State's original case against him.

The State responds that none of these alleged weaknesses in its original case would result in a reasonable probability that appellant would not have been prosecuted or convicted if exculpatory DNA results are obtained. The State further argues that:

> [i]n light of the overwhelming evidence of Appellant's guilt, DNA results from the victim's fingernail scrapings would only be significant if Appellant's DNA were found since an accidental scratch could put someone else's DNA under the victim's fingernails. DNA results from the hairs found would also only be significant if a match were made to Appellant because the hairs were found in a common area of a real estate office and anyone's hair could be on the floor.

**20.** Compare *Ex parte Elizondo*, 947 S.W.2d 202, 207 (Tex.Cr.App.1996) (this Court must sometimes decide on habeas corpus whether newly discovered evidence would have convinced the jury of applicant's actual, factual innocence).

**21.** Compare *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1524, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring in part and in the judgment) (prejudice prong of constitutional ineffective assistance of counsel test is usually an outcome determinative test which requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"); *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 845–46, 122 L.Ed.2d 180 (1993) (O'Connor, J., concurring) (pointing out that majority opinion "in the vast majority of cases" will have no impact on the usual ~~outccome~~ outcome determinative prejudice inquiry of the constitutional ineffective assistance of counsel test even though before *Williams, supra*, majority opinion could have been read as changing this inquiry to whether counsel's unprofessional errors resulted in the conviction of an innocent person); *but compare Strickland v. Washington*, 466 U.S. 668, 711, 104 S.Ct. 2052,

The resolution of appellant's claims presented in point of error two requires us to construe the Article 64.03(a)(2)(A) phrase "a reasonable probability exists that the person would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing." We also decide that this phrase can have different meanings, and is, therefore, ambiguous. It could be interpreted to require a convicted person to show a reasonable probability exists that favorable DNA results would prove his innocence.[20] It could also be interpreted to require a convicted person only to show a reasonable probability exists that favorable DNA results would result in a different outcome unrelated to the convicted person's guilt/innocence.[21] We will, therefore, resort to extratextual sources to construe the foregoing language from Article 64.03(a)(2)(A).[22] *See Jordan*, 36 S.W.3d at 873.

2077, 80 L.Ed.2d 674, 708 (1984) (Marshall, J., dissenting) (complaining that majority rests its holding on the assumption "that the only purpose of the constitutional guarantee of effective assistance of counsel is to reduce the chance that innocent persons will be convicted").

**22.** We initially note that during the April 2, 2001, Senate Floor Debates, the author of Senate Bill 3, Senator Duncan, submitted the following statement of legislative intent into the legislative record:

> During the discussions of the conference committee on **SB 3**, an issue was raised with respect to requirements placed upon the convicted person in bringing a motion for DNA testing. Under the bill, a convicted person must establish, by a preponderance of the evidence, that a reasonable probability exists that the person would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing. This requirement is *not* intended to be a two-part test. The convicted person is not required to show both that a reasonable probability exists that the person whould (sic) not have been prosecuted and that the person would not have been

The legislative history of Chapter 64 makes it very clear that the Legislature intended the foregoing language from Article 64.03(a)(2)(A) to mean a reasonable probability exists that exculpatory DNA tests will prove a convicted person's innocence.[23] This does not, as some opponents of Chapter 64 suggest, require convicted persons to prove their innocence before a convicting court may order DNA testing

convicted. Rather, it is the legislative intent that the person make a showing that reasonable probability exists that the person would not have been convicted if exculpatory results had been obtained through DNA testing.
(Emphasis in Original).
Senate Debate on SB 3, 77th Leg., R.S., (*www.senate.state.tx.us*, Senate Video and Audio Archives at 4:12:00–4:22:00, April 2, 2001) as reported in Senate Journal of Texas, 77th Leg., R.S., at 998 (April 2, 2001).

An almost identical statement of legislative intent was made on the House Floor the next day. House Debate on SB 3, 77th Leg., R.S. (*www.house.state.tx.us*, House Archived Chamber Broadcasts at 0:47:00–0:55:22, April 3, 2001), at 0:50:46.

**23.** Hearings on SB 3 Before the Senate Jurisprudence Committee, 77th Leg., R.S., (*www.senate.state.tx.us*, Senate Jurisprudence Committee Video and Audio Archives at 0:2:48–0:31:30, February 5, 2001), at 0:2:48 (Chapter 64 meant to apply to inmates who were convicted of a crime that "they did not commit"), at 0:3:46 (Senate Bill 3 meant to cover biological evidence that establishes the guilt of the person committing the crime), at 0:25:31 (criminal defense lawyer supporter of Senate Bill 3 stating that it is intended to free "innocent people" from prison), at 0:30:00 (assistant district attorney supporter of Senate Bill 3 stating that it is intended to protect "innocent" people).

Senate Debate on SB 3, 77th Leg., R.S., (*www.senate.state.tx.us*, Senate Video and Audio Archives at 0:17:18–0:37:49, February 19, 2001), at 0:19:00 (during introduction of Senate Bill 3 on the Senate floor, Senator Duncan noted that it is meant to exonerate people of crimes that DNA testing "conclusively" establishes they did not commit), at 0:24:00 (Senate Bill 3 meant to "prove or disprove innocence"), at 0:25:00 (Senate Bill 3 not meant to be used by a "clever defense lawyer" to inadvertently let guilty people out of jail).

Hearings on SB 3 Before the House Criminal Jurisprudence Committee, 77th Leg., R.S., (*www.house.state.tx.us*, House Criminal Jurisprudence Committee Archived Committee Broadcasts at 0:00:00–0:8:00, February 27, 2001), at 0:2:49 (Senate Bill 3 meant to apply to available DNA evidence that would prove a convicted person's guilt/innocence).

House Debate on SB 3, 77th Leg., R.S., (*www.house.state.tx.us*, House Archived Chamber Broadcasts at 1:08:00–2:37:00, March 21, 2001), at 1:57:00 (Senate Bill 3 meant to provide a safety net for "innocent people"), at 2:14:00 (rejecting a House Floor Substitution to Article 64.03(a)(2)(A) that would have read "had exculpatory results been obtained through DNA testing before or at trial, the convicted person could have used those results to raise a reasonable doubt as to the person's guilt or to rebut a part of the prosecution's case"), at 2:37:00 (Senate Bill 3 is legislative effort to free the innocent).

Senate Debate on SB 3, 77th Leg., R.S., (*www.senate.state.tx.us*, Senate Video and Audio Archives at 4:12:00–4:22:00, April 2, 2001), at 4:13:00 (Senate Bill 3 provides convicted persons an opportunity to prove their "innocence").

House Debate on SB 3, 77th Leg., R.S. (*www.house.state.tx.us*, House Archived Chamber Broadcasts at 0:47:00–0:55:22, April 3, 2001), at 0:51:00 (Senate Bill 3 meant to give convicted persons opportunity to prove their factual innocence).

House Criminal Jurisprudence Committee, Bill Analysis of SB 3 at 1, 77th Leg., R.S., (March 4, 2001) (Senate Bill 3 "requires the preservation of evidence that was in the possession of the state during the prosecution of the case and at the time of the conviction was known to contain biological material that if subjected to scientific testing would more likely than not establish the identity of the person committing the offense or exclude a person from the group of persons who could have committed the offense").

House Research Organization, Bill Analysis of SB 3 at 6, 77th Leg., R.S. (March 21, 2001) (Senate Bill 3 meant to "ensure that a favorable [DNA] test would show that an inmate is innocent, not merely muddy the waters in the case").

under Article 64.03.[24] It merely requires convicted persons to show a reasonable probability exists that exculpatory DNA tests would prove their innocence. The legislative history is so clear that this is what the Legislature intended that any other construction would violate the judiciary's ultimate duty to effectuate what the Legislature intended when it enacted the statute. *See Boykin,* 818 S.W.2d at 785. It would be difficult in this particular case to ignore the clear legislative intent repeatedly expressed throughout the legislative history of Chapter 64 and construe the statute any other way.[25]

■ When measured against this legal standard, we cannot say that the convicting court erroneously determined that appellant failed to establish the Article 64.03(a)(2)(A) requirements by a preponderance of the evidence.[26] No reasonable probability exists that exculpatory DNA tests on the evidence for which appellant seeks DNA testing would prove appellant's innocence. At most, exculpatory DNA tests on this evidence would "merely muddy the waters." [27]

The language of Article 64.03(a)(2)(A) and its legislative history also do not con-template a consideration of appellant's "new" post-trial information. And, assuming that Article 64.03(a)(2)(A) does permit a consideration of this "new" post-trial information, appellant's request for DNA testing must still fail.

Appellant claims that "new" information[28] exists establishing that a third item—a tape recorder—was taken from the victim's real estate office at the time of her murder. Appellant claims that this is significant because this tape recorder was recovered from the victim's husband about a month after the murder. Appellant argues that this weakens the State's case against him because the State's theory was that only two items (the videocassette recorder and the computer keyboard) were taken from the victim's real estate office and the State "devoted a substantial portion to capitalizing on the false impression that everything stolen from [the victim] led back to appellant, thus eliminating the possibility that anyone else could have killed the victim." Appellant also points to evidence that the victim and her husband had a "tumultuous" relationship and to other evidence that appellant claims points the finger of guilt at the victim's husband and

24. *See* House Research Organization Bill Analysis of SB 3 at 9, 77th Leg., R.S. (March 21, 2001) (noting that opponents of SB 3 claim that it "could oblige defendants almost to prove they had not committed the crime without having the benefit of the test results to make their case").

25. As further evidence of what the Legislature clearly meant by SB 3, we note that during the March 21, 2001, full House debate on SB 3, the House declined to pass a floor amendment to Article 64.03(a)(2)(A) that would have read "had exculpatory results been obtained through DNA testing before or at trial, the convicted person could have used those results to raise a reasonable doubt as to the person's guilt or to rebut a part of the prosecution's case." *See* House Debate on SB 3, 77th Leg., R.S., (*www.house.state.tx.us,* House Archived Chamber Broadcast at 2:14:00, March 21, 2001).

26. We also cannot say that the convicting court's decision was erroneous under any other reasonable construction of Article 64.03(a)(2)(A).

27. House Research Organization, Bill Analysis of SB 3 at 6, 77th Leg., R.S. (March 21, 2001) (Senate Bill 3 meant to "ensure that a favorable [DNA] test would show that an inmate is innocent, not merely muddy the waters in the case").

28. This is in the form of a police offense report dated June 20, 2001, summarizing the police investigation of this offense.

others.[29]

Appellant's "new" post-trial information, however, merely indicates that one of the victim's co-workers could state only that "to his knowledge" the victim had never removed the tape recorder from her office. And, in its response to appellant's motion for DNA testing, the State presented an affidavit in which the lead investigator in this case swore that the tape recorder "was determined to have been taken before the day of [the victim's] murder, and was not considered to be an item taken in the course of the capital murder."

More important, appellant's "new" post-trial information which appellant claims points the finger of guilt at the victim's husband and others does not explain how these other potential suspects could have come into possession of appellant's tin snips that were used to cut the tie wraps around the victim's neck and ankles.[30] This information also does not explain how appellant came to possess the victim's videocassette recorder and her computer keyboard.

Appellant also complains that the State "used an admittedly pretextual arrest to secure the cooperation of [Landry], its star

witness against [appellant]" and that it is just as likely that Landry murdered the victim. Appellant asserts that Landry "also possessed the same tie-wraps in his van and at his house." Appellant provides no citation to the record to support this assertion and we have found nothing in the record to support it. Even if the record supports this assertion, this information still does not explain how Landry could have come into possession of appellant's tin snips. In addition, the jury convicted appellant even after hearing evidence that Landry had been convicted of attempted murder and that Landry had a "basket full" of electrical wire

We decline to disturb the convicting court's Article 64.03(a)(2)(A) determination that appellant failed to establish by a preponderance of the evidence that a reasonable probability exists that appellant would not have been prosecuted or convicted "if exculpatory results had been obtained through DNA testing." Point of error two is overruled.

### 2. ARTICLE 64(a)(2)(B)

■ In this proceeding, appellant presents various excuses for why he filed his

---

**29.** For example, appellant points to evidence that the victim's husband's car may have been parked in front of the victim's real estate office around the time of the murder. Appellant points to other evidence that another car may have been parked in front of the victim's real estate office around the time of the murder. Appellant also points to other evidence that the electrical wire around the victim's wrists may not have been as rare as the State claimed at trial.

**30.** With respect to the toolmark evidence, appellant asserts that "the testimony of the toolmark examiner overstated the certainty to which identification can be made" and that appellant is currently in the process of having this evidence evaluated by an independent expert. We set out the entirety of appellant's brief on the issue of the toolmark evidence:

> Because undersigned counsel has represented [appellant] for only a few months,

and [appellant's] prior appointed counsel failed to conduct a thorough investigation, counsel has had insufficient time to adequately investigate the case. In addition to the information described above that undermines much of the State's evidence at trial, counsel for [appellant] has reason to believe that the testimony of the toolmark examiner overstated the certainty to which identification can be made, and that the specific toolmark comparison evidence admitted against [appellant] was rendered unreliable by the conditions in which the tests were conducted. [Appellant] is currently seeking access to the tools, tie wraps, and comparative photographs in order to have the evidence evaluated by an independent expert, i.e., one who is not a paid law enforcement official.

Chapter 64 motion for DNA testing just nine days before his scheduled execution date. Among other things, he claims that during his 1997 trial the prosecution "concealed the evidentiary value of the fingernail scrapings" by creating a false impression that it could not be tested for DNA evidence because it contained no blood. Appellant also claims that the prosecution suppressed the strand of white hair recovered from the tie wrap around the victim's neck and that appellant's counsel did not discover this evidence until June 2001.[31] Appellant presents no excuse for why he did not previously request DNA testing on the black hair found on the piece of cellophane on the victim's body.

The State claims that appellant's "serious accusations of prosecutorial misconduct are meritless and unsupported by the evidence in this case." The State further claims that appellant "presents no competent evidence showing that the State concealed evidence, and Appellant could have demanded DNA testing before his trial of at least two, if not all three, of the items." The State claims that appellant's Chapter 64 motion for DNA testing was made to unreasonably delay his execution because appellant's counsel could have requested DNA testing of these items during trial, the direct appeal, the state habeas proceedings and the federal habeas proceedings.

Article 64.01(b)(1)(B), Texas Code of Criminal Procedure, provides:

(b) The motion may request forensic DNA testing only of evidence described by Subsection (a) that was secured in relation to the offense that is the basis of the challenged conviction and was in the possession of the state during the trial of the offense, but:

> (1) was not previously subjected to DNA testing:
>
> > (A) . . . .
> >
> > (B) through no fault of the convicted person, for reasons that are of a nature such that the interests of justice require DNA testing;

The legislative history fails to clearly state what the Legislature meant by this provision. The House Research Organization Bill Analysis of Senate Bill 3 states that DNA testing could be requested "if testing previously was not done through no fault of the offender and if the interests of justice required the testing." [32]

During the March 21, 2001, House Debates, Representative Dutton offered a substitution for current Article 64.01(b)(1)(B) that would have stated "for any reason other than the refusal of the defendant to permit DNA testing." [33] Representative Dutton explained this meant that the convicted person made a conscious decision not to permit DNA testing. The House rejected Representative Dutton's substitution.

In this case, we find it unnecessary to decide exactly when appellant could have previously requested DNA testing. He

---

**31.** The record reflects that the victim's hair was white. The State had claimed in an earlier state habeas corpus proceeding that it did not "unreasonably discount the evidentiary value of this hair" because this "hair could so easily have broken off [the victim] when [appellant] strangled [her]." Appellant responds in this proceeding that the victim "had shoulder-length hair, but the hair recovered from the tie-wrap is no longer than two inches in length."

**32.** House Research Organization, Bill Analysis of SB 3 at 2, 77th Leg., R.S. (March 21, 2001).

**33.** House Debate on SB 3, 77th Leg., R.S., (*www.house.state.tx.us*, House Archived Chamber Broadcasts at 2:00:40–2:06:20, March 21, 2001).

offers no excuse for not previously requesting DNA testing of the black hair on the piece of cellophane. Appellant raised the same prosecutorial misconduct claims regarding the other two items of evidence in a successive habeas corpus application which this Court dismissed as an abuse of the writ. *Ex parte Kutzner*, No. 40,8730–02 (dismissed July 24, 2001) (nonpublished). Thus applicant could previously have raised these claims. *See* Article 11.071, Section 5, Texas Code of Criminal Procedure. It is also significant that there is overwhelming circumstantial evidence of appellant's guilt in *Kutzner II*, that the *Kutzner II* offense is "strikingly similar in many ways" to this offense, and that appellant does not contest his identity as the murderer in *Kutzner II*, nor does he claim that Landry, the victim's husband in this case or anyone else committed the *Kutzner II* offense.

Based on these factors and the foregoing discussion, we decline to disturb the convicting court's Article 64.03(a)(2)(B) determination that appellant failed to prove by a preponderance of the evidence that his request for DNA testing "is not made to unreasonably delay the execution of sentence or administration of justice." Point of error three is overruled.

### C.

In point of error four, appellant claims that this Court should vacate the convicting court's order and remand the case there for further proceedings because the convicting court's findings of fact fail to resolve the majority of the facts necessary to decide whether appellant is entitled to DNA testing and whether he has filed his motion for purposes of delay. In point of error five, appellant claims that this Court should vacate the convicting court's order because it is clearly erroneous and not the product of a careful or independent judicial

determination. Based on our disposition of points of error two and three, this is unnecessary. Points of error four and five are overruled.

The judgment of the convicting court is affirmed.

KEASLER, J., filed a concurring opinion in which JOHNSON, J., joined.

KELLER, P.J., concurs with note.

WOMACK, J., concurred in the result.

KEASLER, J., filed this concurring opinion in which JOHNSON, J. joined.

I agree with the majority's decision to affirm the judgment of the trial court, but I must respectfully disagree with the majority's interpretation of Articles 64.03 and 64.05. I therefore concur only in the judgment.

First, I disagree with the conclusion that the phrase in Article 64.05 concerning an "appeal of a finding under Article 64.03" is ambiguous. It is not. Art. 64.03 is unambiguously separated into subsections (a)(1) and (a)(2). Subsection (a)(1) consists of facts which the trial court "finds." Subsection (a)(2), on the other hand, consists of legal conclusions as to whether the convicted person has established certain elements by a preponderance of the evidence. Article 64.05 refers to "findings" under Art. 64.03, and the only "findings" under Art. 64.03 are those in subsection (a)(1).

Nevertheless, limiting defendants' appeals to fact findings under subsection (a)(1) is an absurd result which the Legislature could not possibly have intended. We have recognized that appellate courts, including this Court, should afford almost total deference to a trial court's determination of facts, but that we should review de

novo questions of law.[1] The very notion of appellate review encompasses a review of questions of law, which necessarily includes the legal conclusions a trial court renders under subsection (a)(2). If the right to an appeal under Chapter 64 is to have any meaning at all, it must include the right to appeal the conclusions of law under Article 64.03(a)(2).

I therefore agree with the majority that we can, and indeed, should review the trial court's conclusions under subsection (a)(2), but I disagree with the Court's rationale.

I also part company with the majority on the interpretation of the phrase "a reasonable probability exists that the person would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing" in Article 64.03(a)(2)(A). That phrase, to me, unambiguously requires the convicted person to show that he would not have been prosecuted or convicted. Nothing in the plain language of the statute refers to actual innocence.

The majority looks to the legislative history to uncover indications that the Legislature intended this phrase to mean proof of actual innocence. But under *Boykin v. State*,[2] it is not proper to even review the legislative history unless the plain language of the statute is either ambiguous or leads to an absurd result. Here, neither is the case. Regardless of the legislative history, our role as an appellate court should be to enforce the plain language of a statute whenever possible. The United States Supreme Court has made this clear. "In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished."[3]

The majority disregards the plain language of Art. 64.03 and instead relies on the legislative history. But that history is not even relevant when the statute's plain language is clear, as it is here. I cannot agree with the Court's analysis in this regard.

Nevertheless, I agree with the Court's holding. Kutzner fails to show a reasonable probability that he would not have been prosecuted or convicted even if exculpatory results were obtained through DNA testing.

I concur only in the judgment of the Court.

KELLER, P.J., concurs with note: I agree with Judge Keasler's analysis of the language of Article 64.03(a)(2)(A), and with his conclusion that applicant has failed to meet the standard imposed by that provision. I therefore concur in the judgment as to that issue, and otherwise join the Court's opinion.

1. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997).

2. 818 S.W.2d 782 (Tex.Crim.App.1991).

3. *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *see also Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991).