

**NUMBER 13-07-00096-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**WILLIAM GEROME KING,** Appellant,

**v.**

**THE STATE OF TEXAS,** Appellee.

---

**On appeal from the 180th District Court of Harris County, Texas.**

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Chief Justice Valdez**

Appellant William Gerome King was convicted by a jury for the offense of capital murder and assessed a punishment of life imprisonment on July 1, 1994. The First Court of Appeals affirmed appellant's conviction on November 22, 1995. *King v. State*, No. 01-94-00754-CR, 1995 WL 694738 (Tex. App.–Houston [1st Dist.] Nov. 22, 1995, pet. ref'd) (not designated for publication). Subsequently, on November 21, 2006, the trial court

denied King's motion for post-conviction forensic DNA testing under chapter 64 of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03 (Vernon Supp. 2007). By a single issue, King argues that the trial court erred when it denied his motion for forensic DNA testing. We affirm.

## I. BACKGROUND[1]

The victim in the underlying murder conviction, Jose Jesus Menchaca, often worked for Francisco Barrientez. Barrientez permitted Menchaca to live in Barrientez's tax office because the office had been previously burglarized. Menchaca slept on a couch and kept a gun under the sofa cushion for protection.

King often came by Barrientez's office and ran errands for Barrientez. Barrientez, however, asked King not to come by the office at closing time with King's friends because Barrientez often left the office with $40,000 to $50,000 in checks. Two weeks before Menchaca's death, Barrientez became suspicious of King because Barrientez's office was burglarized, and King offered to recover the items in exchange for $15.

On the night of Menchaca's death, King came by the office around 7:30 p.m. with a friend, and Barrientez asked them to leave. King and his friend went to a convenience store across the street and returned to the office around 9:00 p.m., only to have Barrientez ask them to leave again. After being asked to leave, King and his friend returned to the convenience store. When Barrientez left the office, Menchaca remained.

The next morning, Barrientez drove by the building and noticed that the front door

---

[1] Our understanding of the underlying conviction comes from the First Court of Appeals's opinion in that case. *See King v. State*, No. 01-94-00754-CR, 1995 WL 694738 (Tex. App.–Houston [1st Dist.] Nov. 22, 1995, pet. ref'd) (not designated for publication).

was open.  Barrientez found Menchaca sitting on the couch with what Barrientez initially believed to be red paint all over Menchaca's face and the surrounding floor.  Barrientez also saw white paint splattered all over the room.  After realizing Menchaca was dead, Barrientez called the police.

Law enforcement authorities contacted King the day after Menchaca's death.  King initially told law enforcement that he last saw Menchaca at 4:00 p.m. the day Menchaca died.  King gave law enforcement permission to search his home.  At King's home, law enforcement found a coat stained with white paint and a pair of shoes with soles that matched a pattern left in the white paint at the tax office.

In his police statement, King claimed he was alone at the convenience store across from the tax office on the night Menchaca died.  He briefly talked to Menchaca as they passed in the store, and King saw Menchaca return to the tax office for the remainder of the night.  King said he saw someone "rush" Menchaca, push Menchaca inside the office, and hit him on the head with a paint bucket when Menchaca opened the office door.  King claimed he went to the tax office and confronted the attacker.  King also said that Menchaca grabbed his gun when the attacker began looting the office.  King claimed that a struggle over the gun ensued between the attacker and Menchaca, during which the gun discharged, killing Menchaca.  King said the attacker left with the gun and other office items.

King later made another statement in which he admitted that he did not tell the police the whole truth in his first statement.  King claimed that on the night of Menchaca's death, he was with his friend, Clifton Fuller.  King said he saw Menchaca at the convenience store, and then King and Fuller parted company.  King then claimed he saw

3

Fuller "rush" Menchaca and push Menchaca inside the office. King alleged that he ran over to pull Fuller off Menchaca. Menchaca then got his gun, and King claimed he grabbed Menchaca's hand to stop him from using the gun, but that during the struggle, the gun discharged, killing Menchaca.

Another witness testified that on the night of Menchaca's death, King sold a gun for crack cocaine. The gun sold was covered with white paint and later identified as the murder weapon. At trial, the medical examiner testified the gun that shot Menchaca was "at least" twenty-four inches away from his head.

## II. DISCUSSION

On June 20, 2006, King filed a motion for forensic testing of DNA evidence and a affidavit in support of his motion. In his motion, King claimed that the police were in custody of the clothing that he wore the night of the murder but never tested it for DNA. King argued that his clothing would contain blood splatter if he had shot Menchaca, and that DNA testing would show the absence of blood splatter, thereby proving his innocence. The State responded to King's motion by arguing that he failed to meet the statutory requirements for post-conviction DNA testing. Specifically, the State argued that he had admitted to being at the scene with Fuller, the individual King claims "rushed" Menchaca, and therefore, King failed to satisfy the identity requirement.

The trial court denied King's motion for post-conviction forensic DNA testing on the grounds that King (1) failed to demonstrate that identity was or is an issue in the instant case; and (2) failed to demonstrate, by preponderance of the evidence, that he would not have been convicted if exculpatory results had been obtained through DNA testing. *See*

4

TEX. CODE CRIM. PROC. ANN. art 64.03(a)(1) (Vernon Supp. 2007).  This appeal ensued.[2]

## A.  Standard of Review

We review a trial court's decision to deny post-conviction forensic DNA testing using the bifurcated *Guzman* standard.  *See, e.g., Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).  Under the *Guzman* standard, almost total deference is afforded to the trial court's determination of historical fact issues and the application of law to facts that turn on credibility or demeanor, but the reviewing court reviews de novo other applications of law to fact issues. *Rivera,* 89 S.W.3d at 59.  The ultimate question of whether a defendant can demonstrate by a preponderance of the evidence that exculpatory DNA tests would prove his innocence is an application-of-law-to-fact question that does not turn on credibility and demeanor and is therefore reviewed de novo*.  Id.*

## B.  Applicable Law

Article 64.03(a), (b) of the Texas Code of Criminal Procedure sets forth the requirements for when a convicting court may order forensic testing:

    (a)    A convincing court may order forensic DNA testing under this chapter only if:
        (1)    the court finds that:
            (A)    the evidence:
                (i)    still exists and is in a condition making DNA testing possible; and
                (ii)    has been subjected to a chain of custody sufficient to establish that it has not been

---

[2] This appeal was transferred to this Court from the First Court of Appeals by order of the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. § 22.220 (Vernon 2004) (delineating the jurisdiction of appellate courts); TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005) (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer).

substituted, tampered with, replaced, or altered in any material respect; and
    (B)    identity was or is an issue in the case; and
(2)    the convicted person establishes by a preponderance of the evidence that:
    (A)    the person would not have been convicted if exculpatory results had been obtained through DNA testing; and
    (B)    the request for the proposed DNA testing is not made to unreasonably delay execution of sentence or administration of justice.

(b)    A convicted person who pleaded guilty or nolo contendere or, whether before or after conviction, made a confession or similar admission in the case may submit a motion under this chapter, and the convicting court is prohibited from finding that identity was not an issue in the case solely on the basis of that plea, confession, or admission, as applicable.

TEX. CODE CRIM. PROC. ANN. art. 64.03 (a), (b) (Vernon Supp. 2007).

A defendant who requests DNA testing can make identity an issue by showing that exculpatory DNA tests would prove his innocence. *See Blacklock v. State,* 235 S.W.3d 231, 233 (Tex. Crim. App. 2007). Moreover, a court cannot make identity a non-issue based solely upon a defendant's guilty plea, confession, or admission. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(b); but see*, Bell v. State*, 90 S.W.3d 301, 308 (Tex. Crim. App. 2002) (suggesting that a prior confession renders identity a non-issue in a Chapter 64 proceeding).

A defendant is not required to prove his "actual innocence" as a condition to establishing his right to DNA testing, but rather, must only show by a preponderance of the evidence that he would not have been convicted if exculpatory DNA test results had been obtained. *Blacklock,* 75 S.W.3d at 233 (citing *Kutzner v. State*, 75 S.W.3d 427, 438-439 (Tex. Crim. App. 2002)). A defendant cannot satisfy this burden by showing that

6

exculpatory test results would "merely muddy the waters." *Rivera,* 89 S.W.3d at 59; *Kutzner*, 75 S.W.3d at 438-39.

## C.    Denial of the Post-Conviction Forensic DNA Testing

On appeal, King argues that the court erred when it found that (1) identity was a non-issue in the instant case, and (2) he failed to demonstrate by a preponderance of the evidence that exculpatory DNA evidence would prove his innocence. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03.

Even if we found that the trial court improperly made identity a non-issue, we conclude that King has failed to demonstrate by a preponderance of the evidence that he would not have been convicted if exculpatory DNA test results were obtained. King relies on the medical examiner's statement that the gun was fired at a distance of "at least" twenty-four inches to support his claim that the victim's blood and DNA would necessarily have splattered onto his shirt at the time the gun was discharged. King fails to note that the medical examiner only testified that the shot was fired from *at least* twenty-four inches. Therefore, the shot could have been fired from a much greater distance, such that the blood would not have splattered onto King's clothing. King also failed to provide explanations for (1) the sale of the firearm implicated in the murder for crack cocaine; (2) the shoe pattern of his white paint-stained shoes that matched a pattern on the floor of the murder scene; or (3) his different statements to law enforcement authorities.

Therefore, we find that the evidence that could be obtained from forensic DNA testing of the shirt King wore at the time of the murder is not sufficient to demonstrate by a preponderance of the evidence that King would not have been convicted if the DNA test

results had been obtained; rather, such evidence could only "mudd[y] the waters" at best. *Rivera,* 89 S.W.3d at 59; *Kutzner v. State*, 75 S.W.3d at 438-39; *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(2). We hold that King failed to satisfy the requirements set forth in article 64.03(a)(2) of the code of criminal procedure in order to obtain post-conviction forensic DNA testing. TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(2). Therefore, King's issue is overruled.

### III. CONCLUSION

The judgment of the trial court is affirmed.

_____

_____
ROGELIO VALDEZ,
Chief Justice

Do not publish. TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and filed
this the 29th day of July, 2008.

8