IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,930
 



 


CHARLES D. RABY, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S APPEAL FROM THE DENIAL OF A MOTION FOR POST-CONVICTION DNA TESTING FROM THE 248TH JUDICIAL DISTRICT COURT 
 OF HARRIS COUNTY




 

 Hervey, J., filed a dissenting opinion in which Keller, PJ., Keasler, and Cochran,
JJ., joined.


 

DISSENTING OPINION



 I respectfully dissent. The Court applies an incorrect legal standard in granting appellant
relief on the basis that "a reasonable probability exists that DNA tests would be exculpatory." See
Raby v. State, S.W.3d slip op at 14 (Tex.Cr.App. No. 74, 930, delivered this date) (granting
appellant's request for DNA testing because appellant "has shown a reasonable probability exists
that DNA tests would be exculpatory"). (1) The correct legal standard requires appellant to prove,
among other things, that a reasonable probability exists that exculpatory DNA tests would prove his
innocence. (2) I would decide that appellant has not met this standard and that, even with exculpatory
DNA tests on the items for which appellant seeks DNA testing, the evidence overwhelmingly
demonstrates appellant's guilt.

 Appellant was charged with murdering a seventy-two year old grandmother during the course
of committing or attempting to commit burglary, robbery or sexual assault. (3) The murder occurred
on October 15, 1992. The victim lived in her home with two grandsons. They had three dogs and
a cat. On the day of the offense, the victim was alive when the grandsons left the home for work at
around 4:00 p.m. When they returned at around 10:00 p.m., the three dogs were in the front yard and
the front and back doors of the home were open. The victim usually kept these doors closed and
locked when she was at home by herself.

 One of the grandsons discovered the victim on the living room floor in a pool of blood. This
grandson testified at appellant's 1994 trial that his arms and hands were covered in blood after he
rolled the victim over to find out what was wrong with her. (4) The victim had been beaten, she had
been stabbed numerous times and her throat had been cut. The medical examiner testified that the
stab wounds could have been inflicted by a pocketknife with a blade as small as two inches.

 Q. [PROSECUTION]: What can you tell us about the blade that was used to inflict
those injuries in terms of possible length or possible-


 A. [MEDICAL EXAMINER]: I noticed that all these stab wounds had a sharp end
and a blunt end. The blunt end was real thin; was not too thick, and that is the type
of weapon that is a knife, that is sharp on one side, the other not.


 Q. Would that be consistent with a pocketknife or a knife?


 A. Yes.


 Q. Now, Doctor, in terms of length, I have got a ruler here in front. Would you
measure off, if you can see the inside, in terms of what's the smallest size that a blade
would have to have been in order to inflict those injuries?


 A. Maybe 2 inches, maybe longer than that, of course. I found-


 Q. Let's stop for just a second. Would you mark off the 2-inch mark? Is that
accurate?


 A. (Complies.)


 Q. So you're saying that is the length of a 2-inch blade; is that correct?


 A. That would be 2 inches, correct.


 Q. Now, why do you say that a blade 2 inches long could have caused those injuries?


 A. No, I didn't say that. What happened is that when you have a blade and you put
the blade inside a human body, there is some kind of give, give of that particular
tissue. For instance, the abdomen has a grade [sic] capacity to be depressed by a
blade. So a blade can go inside the body two more inches in addition to its length. 
In other words, a 3-inch length can produce a 5-inch penetration, a 2-inch blade can
produce 4. Four here was the maximum depth of penetration that I found, but I
didn't find any hilt mark. The hilt mark is a clue in the autopsy table to tell us that
that blade in that particular wound came all the way down or all the way in,
penetrated in. I found no hilt mark here, so the hilt mark may or may not be present,
although the blade penetrated all the way in.


 Q. At any rate, you're not saying the knife blade was 2 inches long, but you're saying
a blade that small could have caused those injuries; is that correct?


 A. Yes.


 The evidence from appellant's 1994 trial also showed that, about a week before she was
murdered, the victim told appellant that he was not welcome at her home. This made appellant so
angry that he threw down a bottle of beer that he was drinking. Evidence was also presented at
appellant's 1994 trial that the killer may have entered the victim's home through a window. 
Appellant had previously entered the home through that window on numerous occasions with the
consent of the grandsons. (5)

 On the day after the offense, the police attempted to arrest appellant at his girlfriends' home. 
He ran out the back door. The police seized a black jacket belonging to appellant at this time. The
police arrested appellant about four days after the offense. Appellant gave the police a written
statement a couple of hours after his arrest. Appellant stated:

 I am at the Houston Police Department's homicide division. Today is Monday,
October 19, 1992, and it is approximately 1:25 p.m. Sergeant Allen read me my
rights on two occasions this afternoon. I fully understand my rights and I have gave
up [sic] my right to remain silent and right to an attorney. I have not been threatened
or promised anything in return to make a statement. I told Sergeant Allen that I not
[sic] been [at the victim's home at the time of the murder]. I was not telling the truth
at first, because I was scared. I decided to tell the truth and get this over with.


 I am living with my mother at [specific address]. My telephone number is [specific
number]. I am unemployed at the present time. I can read and write the english
language. I can see this statement as it is being typed by Sergeant Allen on the
monitor.


 On [October 15, 1992,] I had gotten up [sic] that morning and I had gone [sic] over
to my little brother [Robert]. Robert is living at [specific address] with his father,
[Bob]. Robert's telephone number is [specific number]. Robert was in school and
I visited with a friend by the name of Anthony. Anthony is a hispanic male, about
25-26 years old. Anthony lives next door to Robert. My little brother came home
after school and I stayed at his house until some time that afternoon. My little
brother, Robert gave me a ride on his bicycle to Jimmie's house. We call Jimmie,
"Crawdead [sic]." Jimmie lives off of Laura Koppe street. Jimmie was not there. 
I visited with his mother for awhile. I had a little pocket knife and I was cleaning my
fingernails on Jimmie's front porch. I believe my pocket knife was an "old timer." 
I stayed there at Jimmie's for an hour. I left there and walked over my [sic] ex-mother-in-laws house. They live at [specific address]. I talked to Barbara, Dusty and
Blane. I left their house and walked over to a friend of mine named Larry. Larry
lives off of Irvington. I had been drinking beer and whiskey. I only talked to Larry
for a few minutes. I left Larry's house and walked over to Melody's house on Post
street. I talked to her mother and I left there. I walked over to John Phillips [sic]
house on Wainwright street. I asked John's grandmother if he was at home and she
told me, John was not there. I walked over off of Crosstimbers street to locate a
friend named Pookie. Pookie had moved.


 I went to a little store and bought some wine. I think it was some Mad Dog 20/20. 
I drank the bottle of wine and then I walked over to [the victim's home]. [The victim
lives there with the two grandsons]. There is an old Volkswagon in the drive way at
their house. I walked up to the front door. The front door has a screen type door in
front of a wooden door. I knocked on the door. I did not hear anyone answer. I just
went inside but I did not hear anyone say anything. I heard [the victim] in the
kitchen. I walked into the kitchen and grabbed [the victim]. [The victim's] back was
to me and I just grabbed her. I remember struggling with her and I was on top of her. 
I know I had my knife but I do not remember taking it out. We were in the living
room when we went to the floor. I saw [the victim] covered in blood and underneath
her [sic]. I went to the back of the house and went out the back door that leads into
the back yard.


 Shortly after I had left [the victim's house] I was approached by a man and this man
told me something like "I had better not catch you in my yard," "jumping his fences." 
Or something like that [sic]. I woke up later on the ground near the Hardy Toll Road
and Crosstimbers. I walked home, on Cedar Hill from there. I remember feeling
sticky and I had blood on my hands. I washed my hands off in a water puddle that
is near the pipe line by the Hardy Toll Road. I do not remember what I did with my
knife.


 The next day I knew I had killed [the victim]. I remembered being at her house and
struggling with her and [the victim] was covered with blood when I left. I think I was
wearing a black concert shirt, the blue jeans Im [sic] wearing and my Puma tennis
shoes. I also had on a black jacket. (6)


 The evidence from appellant's 1994 trial shows that on the day of the offense, the victim was
alive when the grandsons left home for work at around 4:00 p.m. One of the victim's neighbors
(Gunn) testified at appellant's 1994 trial that she knew appellant. Appellant had gone to her house
at about 5:00 p.m. on the day of the offense looking for Gunn's son (Jimmie Parks whose nickname
is "Crawdad") and another person. Gunn testified that appellant smelled of alcohol and that he used
a pocketknife to clean his fingernails before leaving Gunn's house at about 6:00 p.m. Gunn testified
that the pocketknife was a "typical pocketknife with the blade on one side and no blade on the other"
and that the blade was "somewhere between two and three inches long." (7) Gunn testified that, before
appellant left her house, appellant asked her whether she thought Jimmie and the other person were
at "grandma's." The victim was known as "grandma."

 The victim was last seen alive on the day of the offense at 4:00 p.m. Her body was
discovered at 10:00 p.m. The victim's daughter (McClain) testified that she spoke to the victim on
the telephone from 6:20 p.m. to 6:45 p.m. Barbara Wright, who is the grandmother of a daughter
of appellant's, testified that she saw appellant between 6:00 p.m. and 6:30 p.m. on the day of the
offense about seven blocks from the victim's home. Another one of the victim's neighbors (Scott)
testified that she knew appellant and that she saw appellant walking down her driveway between
7:00 p.m. and 7:45 p.m. (8) Scott testified that appellant was wearing a dark jacket.

 The brother-in-law (Doyle) of another neighbor (Truitt), who lived behind the victim,
testified that around 8:00 p.m. on the day of the offense, he saw a man walking from the back
towards the front of Truitt's property and jump the fence. Doyle testified that the man had
appellant's build, but that he could not positively identify him. Doyle testified that he and Truitt
confronted the man who jumped the fence.

 Q. [PROSECUTION]: Well, if you don't recognize it, just have a seat. Don't worry
about it.


 Let me ask you the question this way. After you saw the man jump over the fence,
did you see him head or walk in a particular direction?


 A. [DOYLE]: After he jumped over the fence, he walked straight out to Wainwright
and started walking east.


 Q. In the direction of what major intersection?


 A. Irvington.


 Q. About how many blocks away was that, if you recall? Just an estimate.


 A. Well, there's no street in between there on Irvington.


 Q. What happened next?


 A. Okay. Of course I perceived this as an unusual event. My brother-in-law
[Truitt]-it was dark and we were concerned that the man might have done something
there.


 Q. So what did you and your brother-in-law decide to do?


 A. My brother-in-law at the time, of course, he was not out there. He was in the
house. So we started yelling out for him to see if he was okay, and he came out. I
told him I had seen a man just jump over his fence and start walking down the road
here. So we decided to go down and see, you know, why he had come through the
yard. So he got into my truck with me. We drove down the street, and he was quite
a ways down by then, but the area was not well-lit where we stopped him, so we
pulled slightly ahead of him. He was on the left side of the road, on the very edge of
it. We pulled up slightly ahead and stopped my automobile. At that time my brother-in-law opened his door and he went across my car and he asked the man what he was
doing coming through his yard.


 Q. And they had a conversation about that?


 A. Correct.


 The grandsons returned home at around 10:00 p.m. They soon discovered the murdered
victim on the living room in a pool of blood.

 The 1994 trial record also shows that the police did forensic testing on various items of
physical evidence collected in the case and found "[n]othing physical to connect [appellant] to the
crime." The victim's fingernail clippings were collected during her autopsy. Other physical
evidence (some for which appellant seeks DNA testing) was collected at the crime scene.

 Q. [PROSECUTION]: Let me ask you this. In terms of physical evidence, what was
it that was recovered at the scene by Jim Norris, in your presence, that would have
been significant? First of all, did you observe anything at the scene that was
consistent with someone maybe having cleaned their hands?


 A. [ALLEN]: Yes, sir. Adjacent to the [victim] there was a towel on the floor that
had some blood smears on it. It was my opinion that the suspect had wiped his hands
or cleaned his hands, because there was no blood found on the items that were
scattered on the bed.[ (9)] The purse itself had no blood on it. There was no blood on
any of the papers, credit cards or anything within the bedroom area. Additionally, the
exit at this crime scene, the exit, meaning that the door we felt that the suspect had
left the residence, was the rear door of [the victim's] bedroom. There was no blood
located at this exit point.


 Q. In terms of the point of exit, what was your belief, in terms of where the person
had exited the house?


 A. Again, that would have been the rear door that was from [the victim's] bedroom
and into the back yard.


 Q. I'm going to show you these exhibits that I believe I have gotten in some sort of
order. Would you look through these exhibits, which are already in evidence, and
point out to us the item that you believe the assailant used to clean his or her hands?


 A. Exhibit 42 shows the towel that I referred to, just to the southwest of [the
victim's] head. Also Exhibit 43, you can see-


 Q. Would you raise it and point out to the members of the jury now?


 A. This towel right here (indicating).


 Q. That means that the towel above the head; is that correct?


 A. That's correct.


 Q. Did you see anything on the [victim's] body that drew your attention, that you
asked Mr. Norris to collect?


 A. Yes, sir. There was some hair clumped in the victim's hands. There was quite a
bit of hair in the right hand. There was some hair, loose hair, on the left hand, and
a couple other hairs on the body.


 Q. Were you aware there was a dog in the house?


 A. Yes, sir, I was.


 Q. But you had some of those collected, at least some of those collected anyway; is
that correct?


 A. That's correct.


 Q. Are you familiar with Jim Norris' handwriting?


 A. Yes.


 Q. I'll show you what has been marked as State Exhibit 84 and ask you whether or
not you recognize that to be the handwriting of Jim Norris and whether or not that
particular content of that exhibit has relevance to this case?


 A. Yes, sir. Well, this is printing that was done by Officer Norris of the crime scene,
and he has noted that it was recovered by himself, and it's loose hairs that was [sic]
taken from the [victim's] left hand in this particular package.


 Q. And did you observe him recover the hair, put it in the bag and marked [sic] the
bag?


 A. Yes, sir.


 Q. Where would that hair have come from? Which hand, if you know?


 A. The left hand.


* * *


 Q. I'll show you a plastic bag marked State Exhibit 77, the pants in it, pants already
being in evidence. I'll ask you whether or not you can identify the bag and the pants
marked State Exhibit No. 78.


 A. Yes, sir. This is a bag that Officer Norris placed [the victim's] pants from the
crime scene in so it could be sent for testing at a later time.


 Q. What specifically-what kind of tests were you looking for?


 A. We were looking for, of course, blood, semen, anything, hairs, anything that
would have been part of this crime scene.


 Q. I'll show you the bag marked State Exhibit No. 77 and its contents. Can you tell
us what the bag marked State Exhibit 77 is?


 A. Yes, sir. This bag contains a piece of carpet from the living room floor that was
in very close proximity to the body of [the victim]. We brought in an ultraviolet light
in an attempt to see if we could locate any stains, seminal stains in the carpet. Officer
Norris felt like there was some indication there was some fluid there, so the carpet
was cut out and placed in the bag.


 Q. This carpet in State Exhibit No. 77 came from the home of [the victim]; is that
correct?


 A. Yes, sir, it did.


 Q. Specifically, do you remember what part in proximity to her body?


 A. It was in the living room. Again, that's where the body was located. It was just
to the northeast of the body.


 Q. I'll show you what has been marked as State Exhibit No. 79, the bag and the
contents I have just taken out, and ask you whether or not you can identify these?


 A. Yes, sir. That is a pair of panties that were collected from the crime scene in close
proximity to the body of the deceased.


* * *


 Q. Now, for the record, does there appear to be what appears to be blood on those
panties?


 A. Yes, sir, there is.


 Q. And were those the panties that were found next to the body of [the victim]?


 A. Yes, sir, they were.

 

 A Houston Police Department forensic chemist testified that a comparison of appellant's
blood "to the evidence" was inconclusive.

 Q. [DEFENSE]: You analyzed [appellant's] blood with what?


 A. [CHU]: It's only for-it's a known sample for the comparison to the evidence.


 Q. And what have you done with this blood? You determined the type blood
obviously, right?


 A. Yes, I did.


 Q. And you have compared it with whose blood?


 A. I compared it to the evidence.


 Q. And your conclusions from that analysis?


 A. Actually from the evidence, it is inconclusive test results, so I cannot do any
comparison.


 Another Houston Police Department forensic chemist testified that none of the hair found
in the victim's hands was connected to appellant. This chemist also testified that a hair found in a
dead person's hand "does not mean that the hair she's holding belongs to an attacker."

 Q. [PROSECUTION]: In terms of the hands of the [victim], the hair that was taken
from the hand of [the victim], what did you find there? Let me start by asking you
what different types of hair did you find?


 A. [HILLEMAN]: From her right hand, there was a hair that was consistent with her
own hair. There were also some hair fragments and body fragments which were
unsuitable for any kind of comparison. There was also some animal hair and one
head hair which was consistent with the hair of [one of the grandsons].


 Q. Now, would it be unusual if a person lives somewhere, for his hair to fall off and
land on carpet or the floor?


 A. No, it wouldn't be.


 Q. Could we expect to find, if we have carpets, all of us, some of our own hair on the
carpet?


 A. Yes.


 Q. Would it be unusual if a person were being attacked, for that person to fall on the
floor and that person to grasp hair that may be on the carpet?


 A. No, it wouldn't be.


 Q. The animal hair that you found, would they have been consistent with hair of a
dog?


 A. They could have been. I didn't actually make the determination whether they
were a dog or a cat, but they were animal hairs.


 Q. Now, in terms of-you said there was some hair that was unsuitable for
comparison. Would you explain to the members of the jury what you mean by that?


 A. Well, in the hair comparison, I'm looking at an entire hair. I need to see the root
in order to compare the characteristics of that hair to root characteristics from an
unknown source. If I've got a fragment with no root, then I don't really know how
long that hair was. I can't make any kind of approximation of how long it was and/or
make any kind of speculation as to what is missing, what it looks like. So, therefore,
if hair doesn't have a root, we can't do any kind of comparison.


 Q. Just because a hair is found in the hand of a dead person who is lying on the floor,
that does not mean that the hair she's holding belongs to an attacker?


 A. That's correct.


 Q. And if so, we could probably surmise that [the victim] was attacked by both her
grandsons and an animal.


 A. You could surmise that.


 Q. It would be a pretty ridiculous conclusion, in terms of the dog, at least; is that
correct?


 A. Yes.


 Appellant's trial counsel argued to the jury during closing jury arguments at the
guilt/innocence phase of appellant's 1994 trial that appellant only murdered the victim and that he
did not commit any of the aggravating elements that elevated this murder to capital murder. 
Appellant's identity was, therefore, conceded during closing jury arguments at the guilt/innocence
phase of his 1994 trial.

 [THE DEFENSE]: What I'm saying here, what I am submitting to you, is that the
State has proved there was a killing, they have proved that [appellant] committed this
killing, but they have not proved to you beyond a reasonable doubt that [appellant]
either committed or attempted to commit the robbery, the aggravated sexual assault
or the burglary. And I submit to you, after reviewing all the evidence and on your
sworn oath, I think if you consider the evidence in all its light and everything, that
you return a verdict of the lesser included offense of murder. And I thank you for
your attention.

* * *

 And if you do that, you look at all the evidence that's been given to you and make
those reasonable conclusions that you have, because all of you all are real people of
common sense, and you can conclude only one thing, that [appellant] made a
confession, confessed to a horrible thing that he did on the 16th of October. And we
can't search the depth of his mind today or tomorrow. Maybe a psychiatrist can. 
Who knows why people do the things they do to each other. Who knows. Maybe
they can't be articulated. Maybe they're so far deep in the recesses of a person's
mind and soul and heart, that we don't know. But all we do know is what occurred. 
We have the evidence, and I know you will make a conclusion and I think you will
conclude with us is that the truth is that [appellant] killed [the victim] and nothing
more.


 The record thus supports the convicting court's finding that identity was not an issue at
appellant's 1994 trial. (10) It is clear, however, that appellant has changed his trial theory and that he
is making identity an issue in this Chapter 64 proceeding by claiming that exculpatory DNA tests
"could" (11) prove his innocence. (12) And, I agree with appellant that dicta in this Court's decision in
Bell v. State, (13) suggesting that a confession renders identity a non-issue in a Chapter 64 proceeding,
is inconsistent with the "plain" language of Article 64.03(a)(1)(B) and its legislative history. 
Appellant claims:

 Conversely, the State's proposed bright-line rule, in which a confession would
always negate identity as an issue for Chapter 64 purposes,[ (14)] makes no sense given
the language of the statute. First, section 64.03(a)(1)(B) requires testing when
"identity was or is an issue." The inclusion of "is" would be superfluous if an
applicant could not demonstrate that a dispute exists regarding identity regardless of
his defense strategy at trial or previous inculpatory statements made to authorities. 
Second, the statute specifically prohibits a court from denying testing because an
applicant had pled guilty to the crime at issue.[ (15)] Under Art. 64.03(b), a convicted
person who pleaded guilty nonetheless may submit a motion for DNA testing, and
"the convicting court is prohibited from finding that identity was not an issue in the
case solely on the basis of that plea." (Footnote omitted). Under Texas law, a plea
of guilty is a binding admission of all the elements of the charged offense,
including-obviously-identity. (Footnote omitted). If a solemn confession of guilt
before the Court does not itself preclude the Court from finding that identity was an
issue in the trial, it follows logically that a confession of guilt to police-especially under coercive and involuntary circumstances-does not itself preclude the Court
from finding that identity was an issue in the trial.


 Moreover, the Texas Legislature added Article 64.03(b) precisely because of the
concern that numerous defendants have recently been exonerated through DNA
testing despite having "confessed" or pled guilty, as an article published before the
provision was added makes clear. In "Texas Defense Lawyers Worried Bill Doesn't
Go Far Enough," published in the Texas Lawyer in 2001, [an assistant district
attorney] who helped to draft the bill, predicted that the provision would be added. 
(Footnote omitted). Central in [the assistant district attorney's] comments was the
case of Christopher Ochoa, exonerated by DNA testing after serving 12 years in
prison for murder, despite pleading guilty after signing a confession he now claims
was coerced. (Footnote omitted). The drafters of the statute were aware that
determining before testing those likely to be exonerated is a highly unpredictable
business, and if that determination simply tracks the evidence at trial, some innocent
people will be denied testing. As [the assistant district attorney] explained, the
Ochoa case "certainly made us aware that there are things that happen out there that
you would never expect." Even drafters such as Senator Robert Duncan who were
reluctant to provide relief to those who had pled guilty were concerned about
ensuring that cases like Ochoa's were covered by the bill. (Footnote omitted).


(Emphasis in bold and italics [except the reference to Texas Lawyer] in original).

 

 Under the "plain" language of Article 64.03(a)(1)(B), a defendant requesting DNA testing
can make identity an issue by claiming that exculpatory DNA tests will prove his innocence. Article
64.03(a)(1)(B) makes no exceptions for a defendant who has previously confessed (and also
conceded the issue of identity at trial). In addition, the legislative history of Article 64.03 makes it
very clear that it was intended to apply to those defendants who can show that exculpatory DNA tests
would prove their innocence. See Kutzner, 75 S.W.3d at 438-39. This applies even when a
defendant has confessed and conceded the issue of identity at trial. These are the reasons that I
would decide that identity is an issue in this proceeding.

 I would also decide, however, that appellant has not shown that a reasonable probability
exists that exculpatory DNA tests on the items for which he seeks DNA testing (16) would prove his
innocence or that he is entitled to DNA testing of these items under any other reasonable
construction of Article 64.03(a)(2)(A), Tex. Code Crim. Proc. (17) Appellant confessed to murdering
the victim, and his lawyer conceded this issue at appellant's 1994 trial. (18)

 Appellant contends that his confession was involuntary because the police coerced him into
confessing by threatening to charge his girlfriend (who was with appellant when he was arrested and
who accompanied appellant to the police station after he was arrested) with being an accessory after
the fact to the victim's murder. The State argues and I agree that voluntariness claims "are outside
the scope of an appeal from the denial of a request for DNA testing." (19) It is relevant to this Chapter
64 DNA proceeding that appellant testified at the 1994 suppression hearing that, had the police not
coerced him into truthfully confessing, he was prepared to lie to them in an attempt to convince them
that he did not murder the victim. Appellant testified on cross-examination:

 Q. [PROSECUTION]: My point is this. Assuming that that were true, Sergeant
Allen certainly didn't say, "You better sign this confession or I'll put her and the
baby in jail"? I mean, he never did that?


 A. [APPELLANT]: No.


 Q. So that's my point. In terms of you giving that confession, you were giving the
confession because you wanted to come straight with Sergeant Allen?


 A. Yeah. And I wanted her to go home. The quicker I got that over with, the quicker
she could get out of there, because I knew it was just already going to tear her all up,
and why get her even more mad at me?


 Q. I know how women can get mad at you. The point is, you were going to turn
yourself in anyway?


 A. Right.


 Q. And you were going to give the police a full confession anyway?


 A. Well, I was going down there and talk to them. I wasn't planning on-because
that's all they said, they told my mom they just wanted to talk to me, and they told
her mom and her, they just wanted to talk.


 Q. But you knew what they wanted to talk to you about?


 A. Right.


 Q. Are you telling the Judge that you would have come clean with the police anyway
or not?


 A. I don't know. I don't know if I would then or not, because I was prepared to lie
then. I was going to lie, whatever it took to try to convince them I didn't do it.


 Q. Did you ever tell Sergeant Allen that's how you were feeling?


 A. No.


 Q. And you're not telling the Judge that the only reason you signed the confession
was because you wanted to get her out of there? You signed it because you did it
voluntarily and because it's true, right?


 A. Because it's true and, you know-well, he didn't force me to do it, but I wanted her
to go home. I didn't feel that it was right for her to be there.


 Q. And charges were never filed on her, were they?


 A. No, they wasn't [sic] filed.


 Other portions of appellant's confession were corroborated and shown to be true by other
evidence presented at his 1994 trial. The evidence from appellant's 1994 trial shows that the
victim's daughter spoke to the victim until approximately 6:45 p.m. on the day that the victim was
murdered. The grandsons discovered the murdered victim at 10:00 p.m. One of the victim's
neighbors (Scott) who knew appellant saw appellant in the neighborhood between 7:00 p.m. and
7:45 p.m. At 8:00 p.m. a man (with appellant's build) was seen jumping the fence of the neighbor
(Truitt) who lived behind the victim. The witness (Doyle) who saw this testified that he "perceived
this as an unusual event" and that he was concerned that the man "might have done something
there." Appellant confirmed that he was the man who jumped the fence in his statement to the police
describing a confrontation with the victim's neighbor about "jumping his fences."

 Another one of the victim's neighbors (Gunn) confirmed other statements in appellant's
confession that appellant was at her house until 6:00 p.m. on the day of the offense and that appellant
had cleaned his fingernails with a pocketknife that was consistent with the murder weapon. 
Appellant claimed to have "lost" this pocketknife soon after the victim's murder. It is also
significant that appellant told Gunn that he was looking for Gunn's son (Jimmie) and that appellant
wondered whether he might be at "grandma's" which was a reference to the victim. Appellant also
described in his confession struggling with the victim in her living room which is where she was
found by her grandsons. Appellant fled from the police when they attempted to arrest him.

 The totality of this evidence presents a strong circumstantial case that on the evening of
October 15, 1992, appellant murdered the victim in her living room with a pocketknife that appellant
"lost" soon after the victim's murder. In light of the evidence of appellant's guilt in this case,
exculpatory DNA tests would not prove his innocence. (20) Under the best of circumstances for
appellant, exculpatory DNA tests might raise certain inferences that would merely "muddy the
waters" which is insufficient to entitle appellant to DNA testing. (21) See Kutzner, 75 S.W.3d at 439
n.27 (Chapter 64 meant to "ensure that a favorable [DNA] test would show that an inmate is
innocent, not merely muddy the waters in the case").

 I respectfully dissent.

 Hervey, J.


Filed: June 29, 2005

Do Not Publish 
1. The Court's opinion decides that appellant is entitled to DNA testing of three of the four
items for which he requests DNA testing. See Raby, slip op. at 1-2 (DNA testing requested on
underwear, nightshirt, fingernail clippings and hair) and slip op. at 14 (DNA testing granted as to
underwear, fingernail clippings and nightshirt [if it can be found]).
2. See Kutzner v. State, 75 S.W.3d 427, 438-39 (Tex.Cr.App. 2002).
3. See Raby v. State, 970 S.W.2d 1, 2-3 (Tex.Cr.App.), cert. denied, 525 U.S. 1003 (1998).
4. Q. [PROSECUTION]: What did you do next, as far as you can remember?


 A. [GRANDSON]: I pretty much-I remember-it's kind of hard to talk about this, but
I remember, like I said, I rolled her over, and she was laying in all that blood, and
before I even noticed her throat had really been cut, I was looking for a bullet wound,
and that's when I looked up at her. I looked at her face, and that's when I seen her
throat had been cut. About this time I jumped up and I was getting ready to run off
into the front bedroom, because there was a phone in there. It was my bedroom at
the time. I had the phone in there. I was going to call the police and paramedics. 
About that time [the other grandson] showed up at the door.
5. See Raby, 970 S.W.2d at 2 (setting out evidence that grandsons often let appellant into the
home through the window so that appellant could spend the night).
6. The Court's opinion asserts that "[n]o evidence that connected appellant to the crime was
recovered from the jacket." See Raby, slip op. at 8. It is significant, however, that appellant asserted
in his statement to the police that he was wearing a black jacket when he murdered the victim and
that the police recovered a black jacket belonging to appellant the day after the murder.
7. Q. [PROSECUTION]: Did you have an opportunity to look at the pocketknife?


 A. [GUNN]: Yeah, I was looking at it.


 Q. I'm going to show you this ruler that I've got and I'm going to ask you if you can
tell us about how long you estimate that blade was, just the blade.


 A. I'd say between two and three inches.


 Q. So you're saying it's somewhere between two and three inches long?


 A. Yes.


 Q. And was it the typical pocketknife with the blade on one side and no blade on the
other?


 A. Yes, sir.
8. Q. [PROSECUTION]: And what was [appellant doing when you looked through the
door?


 A. [SCOTT]: I didn't see him. I had to open the door and peep out to see him. He
was just walking up on the-off the driveway onto the street.


 Q. Did you call his name and ask him what he wanted?


 A. No, I didn't. I just shut my door.


 Q. And that was about what time of day?


 A. Oh, I'd say between 7:30 or 7:00 to 7:45, somewhere in that neighborhood.


 Q. Just before dark?


 A. Just before dark.


 Q. And in terms of your house, if someone wanted to get to [the victim's] home, all
they would have to do is walk around the block; is that correct?


 A. That's all.
9. Appellant did not request DNA testing on this towel, and the record does not reflect whether
it is currently available for DNA testing. 
10. The convicting court made the following finding in this case.


 The Court finds, based on the trial record, that defense counsel conceded during their
closing arguments at the guilt-innocence phase of the trial that the defendant killed
the complainant (citations to 1994 trial record omitted).
11. Appellant, however, is required to prove that exculpatory DNA tests "would" prove his
innocence. See Kutzner, 75 S.W.3d at 438-39.
12. Article 64.03(a)(1)(B), Tex. Code Crim. Proc., provides that a convicting court may order
DNA testing if the court finds that "identity was or is an issue in the case."
13. 90 S.W.3d 301, 308 (Tex.Cr.App. 2002).
14. I do not read the State's brief as proposing such a bright-line rule. I read its brief as claiming
that identity is not at issue in this Chapter 64 proceeding because appellant confessed and also
because he conceded at his 1994 trial that he murdered the victim. 
15. See Article 64.03(b), Tex. Code Crim. Proc.
16. The Court's opinion fails to note that appellant has abandoned his claim for DNA testing on
the victim's nightshirt. See Appellant's Brief at 26 n.58.
17. Article 64.03(a)(2)(A) requires a convicted person to show that he "would not have been
prosecuted or convicted if exculpatory results had been obtained through DNA testing." In Kutzner,
we interpreted this to mean (based on the clear legislative intent repeatedly expressed throughout the
legislative history of Chapter 64) that convicted persons must show that "exculpatory DNA tests
would prove their innocence." See Kutzner, 75 S.W.3d at 439. This does not, as the Court's opinion
states, render Article 64.04, Tex. Code Crim. Proc., meaningless or require a defendant to show
"that DNA testing will absolutely prove his innocence." See Raby, slip op. at 13.
18. These are relevant considerations in determining whether exculpatory DNA tests would
prove appellant's innocence.
19. In any event, the record from a 1994 hearing on appellant's motion to suppress his statement
supports a finding that appellant voluntarily gave this statement to the police.
20. In its brief, the State argues:


 Assuming arguendo that all three pieces of evidence provided negative results for the
appellant, he still does not meet the Kutzner standard. There is nothing about the
above-mentioned items found at the crime scene that, if linked to a third person,
would cast doubt on the appellant's presence in [the victim's] house or the
appellant's involvement in her murder. It is clear that the possibility of an
exculpatory inference is not enough to meet the statutory requirement for the
convicting court to grant postconviction DNA testing under Chapter 64. Rather, the
appellant must establish, by a preponderance of the evidence, that a reasonable
probability exists that the appellant would not have been prosecuted or convicted if
exculpatory results had been obtained through DNA testing. The appellant fails to
meet his burden. If anything, favorable results for the appellant would only create
an inference of doubt as to his guilt.


 In light of the evidence presented at trial, including the appellant's confession, and
the facts necessary to prove the appellant's guilt, favorable test results would merely
"muddy the waters." This Court has emphatically rejected this premise as a basis
upon which postconviction DNA testing may be granted.


(Emphasis in original). 
21. The Court's opinion also states that one of the grandsons initially named Edward Bangs along
with appellant as possible suspects in the victim's murder. See Raby, slip op. at 5-6, 12. The Court's
opinion does not, however, explain how muddying the waters by speculating about Bangs' possible
guilt entitles appellant to DNA testing. It is also significant that appellant (not Bangs) was the only
person described by the victim's neighbors as being in the vicinity of the victim's home at the time
of her murder.