IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,930






CHARLES D. RABY, Appellant



v.



THE STATE OF TEXAS






ON APPELLANT'S APPEAL FROM THE DENIAL OF A MOTION 

FOR POST-CONVICTION DNA TESTING FROM THE 248th JUDICIAL
DISTRICT COURT OF HARRIS COUNTY





 Johnson, J., delivered the opinion of the Court, joined by Meyers, Price, and
Holcomb, J.J. Hervey, J., filed a dissenting opinion, in which Keller, P.J., Keasler, and
Cochran, J.J., joined. Cochran, J., filed a dissenting opinion. Womack, J., concurred
in the result. Keller, P.J., Keasler, Hervey, and Cochran, J.J., dissented. 



O P I N I O N 



 Appellant appeals from a trial-court order denying post-conviction DNA testing. Tex. Code
Crim. Proc., Ch. 64 (2001). In a hearing before the trial court, appellant sought testing of four items:

 (1) bloody ladies' underwear found next to the victim's body;

 (2) the nightshirt worn by the victim at the time of the murder;

 (3) victim's fingernail clippings; and 

 (4) a hair found on the victim's hand, identified as belonging to the victim's grandson.

 Appellant contends that DNA testing could prove his innocence. (1) In support of his motion,
appellant attached the affidavits of Dr. Elizabeth A. Johnson and Dr. Paul Radelat. (2) The state
concedes that three of the four items are in its possession, (3) but argues that appellant has not met the
requirements of Chapter 64. Specifically, the state does not believe that identity was or is an issue,
that appellant has established by a preponderance of the evidence that a reasonable probability exists
that he would not have been prosecuted or convicted if exculpatory results had been obtained
through DNA testing, or that the appellant has shown that his request is not for the purposes of
delaying the execution of his sentence.

 Appeal under Chapter 64 in capital cases is directly to this court. Tex. Code Crim. Proc.,
Article 64.05. In reviewing a convicting court's order on a motion for DNA testing, this court uses
the bifurcated standard of review articulated in Guzman v. State, 955 S.W.2d 85 (Tex. Crim. App.
1997). Rivera v. State, 89 S.W.3d 55, 58-59 (Tex. Crim. App. 2002)(citing Guzman at 89). The
lower court's findings of fact are entitled to deference, as are any applications of law to fact that turn
on credibility and demeanor. All other applications of law to fact are subject to de novo review,
including the ultimate issue of whether a reasonable probability exists that exculpatory DNA tests
would prove appellant's innocence. Id.

 On appeal, the state argues that the appellant has failed to show, as required by Article 64.03,
that the request for DNA testing was not made to unreasonably delay the execution of sentence or
administration of justice. The record shows that the trial court has never set an execution date for
appellant. Appellant originally filed his motion for DNA testing in November 2002, when his right
to appeal was not yet exhausted. See Skinner v. Texas, 122 S.W.3d 808, 811 (Tex. Crim. App.
2003). The motion remained pending in the trial court for one year and nine months. (4) On these
facts, we do not find that the request was made for the purpose of delay.

Facts

 Appellant was convicted of killing Edna Franklin, who lived in a small house with her two
grandsons, Eric Benge and Lee Rose. Benge and Rose testified that they left Mrs. Franklin at home
alone shortly before 4:00 p.m. on October 15, 1992. Benge testified that he returned later that
evening and found the front door unlocked and open, the back door open, the lights out, and Mrs.
Franklin dead in the living room. Hair was recovered from each of her hands. She was nude from
the waist down and had been stabbed to death. The medical examiner could not determine if she had
been sexually assaulted. The house had been ransacked. The contents of Mrs. Franklin's purse and
other personal items were scattered around her bedroom. 

 Sergeant Allen testified that the home was dilapidated and had not been cleaned in some
time. Eric Benge testified that the back door was kept closed and the front door was always locked. 
On the day of the murder, Eric Benge had nailed a screen over a window in his bedroom that was
sometimes used as an entrance by the grandsons, appellant, and at least one other person, Edward
Bangs. When Benge returned home, he found that the screen had been removed from the window. 
Police found footprints below the window, a screwdriver on the window, and a fresh wood chip. 
They concluded that the killer entered Mrs. Franklin's home through the bedroom window.

 Shirley Gunn, who lived near Franklin, testified that the appellant came by her house around
5:00 p.m. looking for Gunn's son and another man. Gunn stated that appellant used a pocketknife
to clean his fingernails and that he smelled of alcohol. He also asked Gunn if she thought her son
might be at Franklin's home.

 Mary Alice Scott testified that she went to answer a knock at her back door some time
between 7:00 p.m. and 7:45 p.m. and saw the back of a person who was wearing jeans and a black
jacket, (5) and who she believed to be Mr. Raby, walking away from her in her driveway. She
described the lighting conditions as "dusk." Scott had seen Raby in her living room a week or two
before the murder. Prior to that, it had been more than two years since she had seen him. She was
confident in her identification because "[n]one of those boys were built exactly like [him] . . . I'm
talking about his size and his legs, the way he walks, low-built in the back end." (6)

 Leo Truitt lived in a house directly behind Franklin's. At about 8:00 p.m. on October 15, his
brother-in-law, Martin Doyle, saw a man walk through Truitt's yard, jump over the front fence, and
walk away. Doyle and Truitt pursued the man in Truitt's car, and Truitt confronted the man,
inquiring what he was doing in Truitt's yard. Doyle saw only half of the man's face. After this
conversation, the unidentified man left on foot.

 Martin Doyle testified that the man was a white male, 6 feet or slightly under, maybe 510
with a medium build. Doyle could not positively identify Mr. Raby as the man he saw that evening.

Truitt did not testify. However, at the suppression hearing, Houston Police Department Homicide
Sergeant Bill Stephens stated that Mr. Truitt had told him "that he had observed a white male that
he described as early 20's, 5-7 to 5-8, 155 to 165 pounds, with dark-colored hair but not black;
medium-short, as far as the hair. No glasses, no facial hair." (7) Truitt neither named appellant nor
picked him out of a lineup. Sergeant Allen testified that Mr. Raby was approximately 5 7 and had
a medium build. His "guesstimate" was that the defendant weighed between 150 and 160 pounds. 

 When questioned by police about possible perpetrators, Benge named both appellant and 
Edward Bangs. Investigators included the information from Benge in their reports.

Benge also stated that it may have been Edward Bangs, W/M 21-23, who is a drug
addict and who has been helping to paint [the house]. Benge stated that Bangs stole
his paycheck and shotgun a while ago and that Bangs is the only other person he can
think of that may have done this. Benge stated that Bangs and Raby would be the
only ones that would know about the SE bedroom window facing East that has a
broken pane and can be easily opened.


Officer also spoke to witness across the street . . . at approx 1750-1800 hrs she saw
a W/M on East side of [complainant's residence] by SE bedroom window looking
like he was taking the screen off . . . she did not think anything of it because
[complainant] had been having house painted and that she thought that was what
[suspect] was doing . . . she did not get a good look at all at [suspect]. (8)



 The only physical description of Bangs was provided by Benge in court. 

Q: [PROSECUTION] And compared to the Defendant, is he [Bangs] bigger or smaller?

A: [BENGE] He's bigger.

Q: About how big is Mr. Banks [sic]?

A: I'd say he's about -from Mr. Raby himself, he's probably about 4 inches taller.

Q: How big is Mr. Banks [sic]?

A: He's a big person. He's ever [sic] bit as big as I am.

Q: And how tall are you?

A: I'm 6-1.

Q: Now, for the record, how tall is Mr. Raby, if you know?

A: I don't know. I'd say approximately maybe 5-11.

[The Court has Mr. Raby and Mr. Benge stand facing one another.]

Q: How much taller than he [Raby] would you say you are, Mr. Benge?

A: I'd say probably about 3 inches, 4 inches taller than he is.

Q: Okay. You can have a seat.

A: (Complies.)

Q: And how much do you weigh?

A: I weigh 255.

Q: For the record, would you agree that Mr. Raby is considerably lighter than you?

A: Yes, sir. (9)

 Benge testified that he had last entered the house through the window three days before the
trial and that his cousin, Lee Rose, had used the window as an entrance "on several occasions." Rose
testified that he and Benge used the window as an entrance to the home. Rose claimed that he was
at work during the murder. However, Mary Alice Scott, the neighbor who lived near the victim's
home, testified that her grandson and Lee Rose "were together, running in and out" on the day of the
murder. (10)

 Eric Benge testified that, when he left work that evening, he went to a friend's house to
shower before going to his girlfriend's house, where he stayed until 9:45 p.m. He discovered his
grandmother's body at approximately 10:00 p.m. He testified that the front and back doors to the
house were open and that the sheet that hung between the living room and the kitchen was still in
place and he had to push it aside to walk into the kitchen. Benge also testified that when he turned
his grandmother over he got blood on his hands and that he was pretty sure he left blood on the
phone. However, police found no blood evidence anywhere in the home other than in the immediate
vicinity of the body. Sergeant Allen with Houston Police Department testified 

It was my opinion that the suspect had wiped his hands or cleaned his hands, because
there was no blood found on the items that were scattered on the bed. The purse
itself had no blood on it. There was no blood on any of the papers, credit cards or
anything within the bedroom area. Additionally . . . the door we felt that the suspect
had left the residence, was the rear door of Ms. Franklin's bedroom. There was no
blood located at this exit point. (11)


 Allen testified that Benge had told the police that he had washed his hands after attempting
to revive his grandmother.

 Hair samples were collected from the crime scene. None were consistent with the appellant's
hair. The hair on Franklin's right hand was consistent with her own hair, while the hair in her left
hand was consistent with the hair of one of her grandsons. (12) The blood under the victim's fingernails
was typed, and the results showed types AB and B. Franklin's blood type was A, while appellant's
blood type is O. (13) Sergeant Allen testified that Ms. Franklin's injuries were inflicted with a knife
blade as short as two inches long and sharpened on only one side. A paring knife was found in Eric
Benge's bedroom. It was dusted for prints, but none were recovered. There was no blood visible
on the knife, and no further analysis was conducted on it. 

 Police obtained a warrant for appellant's arrest on October 16, the day after the murder. In
an attempt to find appellant, they went to the home of his girlfriend, Mary Gomez. At her home,
they recovered a black jacket belonging to appellant. No evidence that connected appellant to the
crime was recovered from the jacket.

 On October 19, 1992, appellant signed the following statement: 

 I am at the Houston Police Department's homicide division. Today is Monday,
October 19, 1992, and it is approximately 1:25 p.m. Sergeant Allen read me my
rights on two occasions this afternoon. I fully understand my rights and I have gave
up [sic] my right to remain silent and right to an attorney. I have not been threatened
or promised anything in return to make a statement. I told Sergeant Allen that I not
[sic] been at Lee's house on Westford Street on Thursday night. I was not telling the
truth at first, because I was scared. I decided to tell the truth and get this over with.

 I am living with my mother at 3414 Cedar Hill in Houston, Texas. My telephone
number is 987-1418 and 987-8869. I am unemployed at the present time. I can read
and write the English language. I can see this statement as it is being typed by
Sergeant Allen on the monitor.


 On Thursday, October 15, 1992 I had gotten up that morning and I had gone over to
my little brother Robert Butler. Robert is living at 3215 Sparks with his father, Bob
Butler. Robert's telephone number is 695-5259. Robert was in school and I visited
with a friend by the name of Anthony. Anthony is a Hispanic male, about 25-26
years old. Anthony lives next door to Robert. My little brother came home after
school and I stayed at his house until some time that afternoon. My little brother,
Robert gave me a ride on his bicycle to Jimmie's house. We call Jimmie, "Crawdead
[sic]." Jimmie lives off of Laura Koppe street. Jimmie was not there. I visited with
his mother for awhile. I had a little pocket knife and I was cleaning my fingernails
on Jimmie's front porch. I believe my pocket knife was an "old timer." I stayed
there at Jimmie's for an hour. I left there and walked over [sic] my ex-mother-in-laws house. They live at 7719 W. Hardy. I talked to Barbara, Dusty and Blane. I left
their house and walked over to a friend of mine named Larry. Larry lives off of
Irvington. I had been drinking beer and whiskey. I only talked to Larry for a few
minutes. I left Larry's house and walked over to Melody's house on Post street. I
talked to her mother and I left there. I walked over to John Phillips house on
Wainwright street. I asked John's grandmother if he was at home and she told me,
John was not there. I walked over off of Crosstimbers street to locate a friend named
Pookie. Pookie had moved.


 I went to a little store and bought some wine. I think it was some Mad Dog 20/20. 
I drank the bottle of wine and then I walked over to Lee's house on Westford Street.
Lee lives there with his grandmother, Edna and his cousin Eric. There is an old
Volkswagon [sic] in the drive way at their house. I walked up to the front door. The
front door has a screen type door in front of a wooden door. I knocked on the door. 
I did not hear anyone answer. I just went inside. I sat down for a little bit on the
couch. I called out when I got inside but I did not hear anyone say anything. I heard
Edna in the kitchen. I walked into the kitchen and grabbed Edna. Edna's back was
to me and I just grabbed her. I remember struggling with her and I was on top of her. 
I know I had my knife but I do not remember taking it out. We were in the living
room when we went to the floor. I saw Edna covered in blood and underneath her. 
I went to the back of the house and went out the back door that leads into the back
yard.


 Shortly after I had left Lee's house on Westford I was approached by a man and this
man told me something like "I had better not catch you in my yard," "jumping his
fences." Or something like that. I woke up later on the ground near the Hardy Toll
Road and Crosstimbers. I walked home, on Cedar Hill from there. I remember
feeling sticky and I had blood on my hands. I washed my hands off in a water puddle
that is near the pipe line by the Hardy Toll Road. I do not remember what I did with
my knife.


 The next day I knew I had killed Edna. I remembered being at her house and
struggling with her and Edna was covered with blood when I left. I think I was
wearing a black concert shirt, the blue jeans Im [sic] wearing and my Puma tennis
shoes. I also had on a black jacket.


Analysis

 In his first point of error, appellant asserts that the district court erred in holding that our
decision in Bell v. State, 90 S.W.3d 301 (Tex. Crim. App. 2002), established as a matter of law that
the existence of a statement bars a petitioner from showing that "identity was or is an issue in the
case." Id. at 308. The state concedes that a statement does not create an automatic bar to
establishing an issue of identity under Chapter 64. However, the state argues that identity was not
an issue in this case because appellant did not deny the voluntariness and truthfulness of his
statement and his counsel ultimately admitted the killing at trial and relied on an elements argument.

 Until closing arguments at trial, when defense counsel argued that the prosecution had not
met its burden of establishing the elements of capital murder, the only issue presented was one of
the murderer's identity. There was no question that a murder had occurred and that no other legal
defenses, such as self-defense, insanity, or consent, were presented. Appellant also raised the issue
of identity in his habeas corpus proceedings. Given the facts of this case, identity is, or was, an issue
as required under Article 64.03.

 In his second point of error, appellant asserts that the district court erred in failing to consider
his evidence. (14) Appellant argues that, if his evidence had been considered, the trial court would
have found that he had made a sufficient showing under Article 64.03 that it is reasonably probable
that he would not have been prosecuted or convicted if exculpatory results were obtained.

 In Rivera, this court held that a hearing is not required because the legislature could have
intended issues to be "resolved by affidavits, which could be submitted by the convicted person
along with his motion." Id. at 59. Although Appellant is not entitled to a hearing under article
64.03, affidavits submitted by the appellant should be considered by the court. (15) Rivera v. State, 89
S.W.3d 55, 58-59 (Tex. Crim. App. 2002). Consideration of all evidence is particularly important
because a written order is required of the trial court when it rules on an Article 64.03 motion for
appellate purposes. Cravin v. State, 95 S.W.3d 506, 508 (Tex. App.-Houston [1st Dist.] 2002, pet.
ref'd). The record does not allow us to determine whether the trial court did not, in fact, consider
appellant's evidence. The record does show that the trial court adopted the state's proposed findings
of fact verbatim. 

 In the defense affidavit from Dr. Elizabeth Johnson, she stated that "[i]t is common in cases
of direct assault with a knife that there will be a struggle in which biological material from the
attacker can be transferred to the fingernails of the victim," and that "[i]f found, large clumps of skin
under the nails would indicate considerably more contact than could be explained by the transfer of
DNA by an innocent handshake or common use of a towel. Her affidavit also states thatHouston Police Department's crime lab's blood typing results suggest that the
fingernails may hold blood other than Mr. Raby's or the decedent's. The decedent's
blood type was B, while Mr. Raby's is type O, which means that his blood lacks both
A and B blood group substances. Two samples were taken from the decedent's
fingernails, each representing one hand: one showed consistent results of blood type
AB, while the other revealed B type activity. These results could indicate the
presence of blood group substance A on the nails, which is foreign both to the
decedent and to Mr. Raby. . . . the blue panties found near the body at the crime
scene could yield probative evidence as to the identity of the victim's attacker. The
homicide report described these, saying that they "appeared to have blood smeared
on them . . ." [i]f the attacker himself were cut, and if he used the panties to wipe his
hands after the attack, then some of the blood on the panties could be the attacker's. 
DNA testing can detect DNA of multiple individuals that has been mixed and can be
very definitive in eliminating someone as a donor, even in a mixed sample. If blood
other than Ms. Franklin's is found on the panties, that could indicate the identity of
the attacker. (16)


 Also included in the evidence that appellant presented to the trial court was a police report,
indictment, and the plea bargain of Edward Bangs, who was sentenced to eight years in the
institutional division of Texas Department of Criminal Justice for robbing a 63-year-old
acquaintance in August of 1993, during which he threatened to kill her if she did not give him her
purse.

 This court has interpreted the provisions of Article 64.03 to mean that an applicant must
show that "a reasonable probability exists that exculpatory DNA tests would prove their innocence."
Kutzner v. State, 75 S.W.3d 427, 439 (Tex. Crim. App. 2002), but the DNA testing should not be
ordered if the results will "merely muddy the waters." Id. 

 In Kutzner, the murder involved in a real-estate office with public access and a victim who
had an active lifestyle. (17) If DNA from other people had been found, it would not have exculpated
the applicant, as DNA from numerous others would be expected. In the present case, however, the
crime scene was a private home, and the victim was ill and rarely left the house or had contact with
anyone other than her grandsons. There are a maximum of four items to be tested and few suspects 
for comparison. The waters would not be muddied by exculpatory DNA evidence.

 Appellant is also requesting that the hair found in the victim's hand be re-tested with the
technology currently available to determine if it really did belong to one of the grandsons with whom
the victim lived or if it belonged to an unidentified person. (18) Testing of this hair would not assist
the inquiry; the grandsons lived in the house, and it would be highly unusual if their hair was absent,
while both appellant and Bangs were in the home on a number of occasions before the murder, and
finding hairs from either or both or them would not be remarkable.

 Of course, ordering DNA testing does not end the inquiry. Once DNA testing is completed,
the results are still subject to a hearing under Tex. Code Crim. Proc., Article 64.04. (19) The trial
court must determine in that hearing whether, if the results had been available during the trial, "it is
reasonably probable that the person would not have been prosecuted or convicted."Id. As in the
determination of whether DNA testing is warranted, proof of innocence is not required. If the court
requires the appellant to show that DNA testing will absolutely prove his innocence, Article 64.04
would be rendered meaningless.

Conclusion

 The evidence against the appellant comprised testimony that put him in the vicinity at the
approximate time of death, his statement, and the jacket that he had been wearing on the day of the
murder. No blood or other physical evidence that connected appellant to the scene was recovered. 
In his statement, appellant did not say he stabbed the victim. In some aspects, appellant's statement
contradicts the testimony of police officers about the physical evidence from the crime scene. (20) 
Sergeant Allen testified that there was no physical evidence to connect Mr. Raby to the crime, (21) and
he agreed that DNA testing would be useful in this case. (22)

 Appellant has shown a reasonable probability exists that DNA tests would be exculpatory. 
We overrule the denial by the convicting court of appellant's motion for DNA testing pursuant to
Chapter 64. Appellant's motion for DNA testing is granted as to the underwear, fingernail clippings,
and the nightshirt, if it can be found.

 Johnson, J.

En banc

Delivered: June 29, 2005

Do not publish
1. During oral arguments, appellant's counsel stated that, if they are given access to the requested items,
appellant will pay the costs of the testing.
2. It is probable that appellant did not have access to independent DNA testing during his trial. Dr. Elizabeth
Johnson states in her affidavit: 

"PCR testing became available in the first half of 1994 in the Harris County labs, but I do not
know whether DNA testing of any kind was actually available to an indigent defendant in Harris
County. While I was employed there, the Harris County Medical Examiner's Office, along with
the HPD lab, performed the majority of DNA testing for criminal cases brought in Harris County.
During my tenure there at that office, 1991 to 1996, I cannot recall a single instance in which
biological evidence was sent for DNA testing by a defendant at the expense of the State or the
court. Conversely, I can recall several instances in which defendants with privately retained
attorneys paid for such testing in the mid-1990s at their own expense."
3. The state is unable to locate the nightshirt, which has been missing since trial. However, recently
discovered boxes in the property room of the Houston Police Department prompted the appellant to continue to
request testing for the nightshirt if it is found in the boxes. 
4. Contributing to the delay was the trial court's decision to appoint an attorney other than his current federal
habeas corpus counsel to represent appellant in these proceedings despite his current attorneys' announcement in
open court that they were willing to represent him pro bono. The attorney appointed by the trial court was not on the
capital appellate-appointment list and did not receive notice of the January 29, 2003, oral argument.
5. Police recovered a black jacket from the home of appellant's girlfriend. No evidence connecting appellant
to the murder was found on the jacket.
6. Trial transcript, volume XXVIII, p. 310.
7. Transcript of suppression hearing, volume XXV, p. 8.
8. Homicide Report at 2.021.
9. Trial transcript, volume XXVII p. 156. 
10. Trial transcript, volume XXVIII, p. 304.
11. Trial transcript, volume XXVIII, page 190.
12. Appellant argues that the "microscopic hair analysis" technology used to make this determination was a
scientifically unreliable basis for hair identification. Therefore, he seeks to have DNA testing conducted on this hair
as well. However the presence of hair from a resident is not strong evidence of involvement in the crime.
13. HPD crime lab chemist Joseph Chu conducted blood-test comparisons, which he found to be
"inconclusive." 
14. The findings of the trial court state, "Having considered the defendant's post-conviction motion
requesting DNA testing of evidence, pursuant to Chapter 64 of the Texas Code of Criminal Procedure; the State's
motion requesting that DNA testing be denied; and, the affidavits of Elena Siurna, Reidun Hilleman, K.L. McGinnis,
Jerry Werner, Melchora Vasquez, John R. Thorton, and Roberto Gutierrez, the court makes the following findings . .
.." There was no mention of appellant's affidavits.
15. A hearing is not prohibited.
16. Dr. Johnson concluded that DNA results could prove appellant's innocence. The State did not present
controverting evidence. 
17. The court also noted that the appellant in Kutzner had been convicted by "overwhelming circumstantial
evidence" of a "strikingly similar" murder and that he did not contest his identity in that case.
18. Dr. Elizabeth Johnson's affidavit states: "The hair was identified through 'microscopic hair analysis;' in
other words, a scientist closely examined the hair through a microscope for similarities to other hair samples. 
Microscopic hair analysis is a scientifically unreliable basis for hair identification."
19. The version of the Article applicable to the appellant is as follows: "After examining the results of testing
under Article 64.03, the convicting court shall hold a hearing and make a finding as to whether the results are
favorable to the convicted person. For the purposes of the article, results are favorable if, had the results been
available before or during the trial of the offense, it is reasonably probable that the person would not have been
prosecuted or convicted." Tex. Code Crim. Proc., Art. 64.04.
20. The statement states that he had struggled with Mrs. Franklin, that he was on top of her, and that he saw a
lot of blood underneath her before he left through the back door. Further, appellant stated that his hands were
bloody and that he washed them off in a puddle away from the crime scene. The police testified that the only blood
at the scene was near the body; they found no blood on the telephone (contra Eric Benge),and stated their belief that
the suspect had wiped his hands or cleaned his hands, because there was no blood found on the purse, papers, credit
cards, or the other items that were scattered on the bed and within the bedroom area. The police concluded that the
suspect left the residence through the rear door in Mrs. Franklin's bedroom, but no blood was found on the door. 
21. Raydun Hilleman, a Houston Police Department chemist, did not find that any hairs from the crime scene
were consistent with Raby's hair, nor did he find any of the victim's hair on the clothes recovered from Mr. Raby's
home.
22. In his supplemental report dated October 29, 1992, Sergeant Allen wrote: "We are requesting D.N.A.
[sic] be done if possible in this case."